UNITED STATES of America,
Appellee,

v.

Salvatore GIORDANO, Appellant.

No. 496, Docket 73–2369.

United States Court of Appeals,
Second Circuit.

Submitted Dec. 6, 1973.

Decided Dec. 21, 1973.

Robert A. Morse, U. S. Atty., E. D. N. Y. (L. Kevin Sheridan and James A. Pascarella, Asst. U. S. Attys., of counsel), for appellee.

Evseroff, Newman & Sonenshine, Brooklyn, N. Y. (Gustave H. Newman, Brooklyn, N. Y., of counsel), for appellant.

Before WATERMAN and FEINBERG, Circuit Judges, and GURFEIN,* District Judge.

GURFEIN, District Judge.

Salvatore Giordano appeals from a judgment of the United States District Court of the Eastern District of New York (Dooling, J.), entered on August 17, 1973, which convicted appellant, after a jury trial, of violations of 18 U.S.C. §§ 656 and 1004.

The defendant, with his two brothers, was tried by a jury on a superseding indictment which, at trial, consisted of two counts, the first count of conspiracy having been dismissed. Count two charged the defendants with causing employees of the Bankers Trust Company ("Bankers Trust") to abstract and willfully misapply moneys, funds and credits of Bankers Trust in excess of $100 in violation of 18 U.S.C. § 656.[1] The third count charged the defendants with causing an employee of Bankers Trust falsely to certify four checks, totalling $400,000, in violation of 18 U.S.C. § 1004.[2] Salva-

---

* Honorable Murray I. Gurfein, of the United States District Court for the Southern District of New York, sitting by designation.

1. Section 656 reads in part:
"656. *Theft, embezzlement, or misapplication by bank officer or employee*
Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

2. Section 1004 reads:
"1004. *Certification of checks*
Whoever, being an officer, director, agent, or employee of any Federal Reserve bank or member bank of the Federal Reserve System, certifies a check before the amount thereof has been regularly deposited in the bank by the drawer thereof, or resorts to any device, or receives any fictitious obliga-

tore Giordano was convicted on both counts. His brothers were acquitted, and Judge Dooling sentenced him to a prison term of one year and a day on each count, the sentences to run concurrently. Appellant contends that there was an insufficiency of evidence under either count, and that the Judge erred in the charge to the jury. We affirm.

Salvatore and Anthony Giordano, before the time specified in the indictment (January 1, 1967 to April 4, 1969), had opened regular checking accounts at Bankers Trust (Van Wyck branch) and National Bank of North America ("North America") (Baisley Park branch). There were two accounts at Bankers Trust, one in the name of "Baywood Stables" and the other in the name of Salvatore Giordano. The checking account of concern in the instant case at North America was in the name of "Bay Auto Sales." Salvatore and Anthony Giordano were the authorized signatories on these accounts.

The deposits in each account were composed of withdrawals (checks drawn) from the other account(s) at the other bank. That is, the deposits at Bankers Trust were made fairly equally into the Baywood Stables and Salvatore Giordano accounts and were composed of checks drawn on the Bay Auto Sales account at North America. The deposits into the Bay Auto Sales account were made up of checks drawn essentially equally on the Baywood Stables and Salvatore Giordano accounts. Occasionally, checks drawn on the various accounts were presented for cash over the counter.

Between January 1, 1967 and April 4, 1969, the above deposits and withdrawals were made on a daily basis by the brothers. The deposits in the two accounts at Bankers Trust and in the account at North America were substantially all uncollected checks drawn on the other bank. The process was one of "kiting checks." "Kiting" occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the "kiting" equilibrium.

Robert Kamsler and Martin Shaughnessy, respectively manager and assistant manager at the Van Wyck branch of Bankers Trust, the named co-conspirators in this indictment, testified on behalf of the Government. Both these individuals realized in early 1967 that a check "kite" was being worked with the two accounts at Bankers Trust and the Bay Auto Sales account at North America. Nonetheless, both, upon discovering this, let the situation continue. They observed the withdrawals and deposits snowballing from approximately $100,000 daily in 1967 to over $400,000 daily in early 1969. In addition, they were aware that the daily balances in the accounts remained fairly constant and relatively low in relation to the amount of activity. This indicated to them that a kiting situation was in existence. Further, Mr. Kamsler, the bank manager, was familiar with the business of the Giordanos and knew that the business did not "warrant" the amount of money involved in the activity of the accounts.[3]

Mr. Shaughnessy, the assistant manager, permitted the checks presented by the Giordanos to be "treated as cash" and, in fact, authorized such treatment

tion, directly or collaterally, in order to evade any of the provisions of law relating to certification of checks, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

3. The Giordanos owned a small used car business and several harness racehorses.

by initialling the checks presented. Appellant had requested that the checks be treated in this manner. Kamsler knew that Shaughnessy was giving such authorization to the Giordanos and did not act to stop it. While several other accounts at the branch had checks given "immediate credit" no other accounts had checks deposited treated as "cash." The deposits were actually listed on the deposit slips under the column "cash" rather than the column for "checks",.for reasons that will appear.

Shaughnessy at no time authorized a loan to any of the Giordanos and never told them the bank was lending them money. Nor did Kamsler ever authorize a loan, except for one installment loan to each of the Giordanos in 1966 in the amount of $3500.

Not all the checks drawn on the accounts in question were deposited in one bank or the other. A number of checks over this period of time (January 1967-April 1969) were made out to cash, to the Giordanos, to employees of the Giordanos and to various individuals supplying the needs of the Giordanos' business. The total amount of money claimed by the banks as owed to them is more than $880,000.

On March 28, 1969, the deposit slips for all cash deposits made at Bankers Trust that day were, for some unknown reason, not picked up and sent to the bank's central accounting division as was the usual bank procedure, with results that will appear.

I

Cases in which customers of a bank are charged with aiding and abetting a bank officer willfully to misapply money or credit of the bank, 18 U.S.C. § 656, are generally troublesome. That is because an appellate court must weigh with care whether the facts proved are sufficient to prove the knowledge and intent required to support the guilty verdict. See, e. g., Logsdon v. United States, 253 F.2d 12, 14 (6 Cir. 1958); United States v. Docherty, 468 F.2d 989 (2 Cir. 1972); cf. United

States v. Matot, 146 F.2d 197, 198 (2 Cir. 1944). The depositor, not being "connected in any capacity" with the bank cannot be guilty of violating 18 U.S.C. § 656 as a principal. See United States v. Weitzel, 246 U.S. 533, 38 S.Ct. 381, 62 L.Ed. 872 (1918); United States v. Tornabene, 222 F.2d 875, 877 (3 Cir. 1955). He can, however, be charged as an accessory under 18 U.S.C. § 2. He may not be convicted as an accessory, however, unless the bank officer, as a principal is himself guilty of violating Section 656. United States v. Tornabene, *supra,* at 878. See United States v. Pyle, 279 F. 290, 293 (9 Cir. 1921). Even if the bank officer was guilty as a principal, there must also be proof that the defendant depositor had knowledge of the criminal activity of the bank officer (see United States v. Turnipseed, 272 F.2d 106, 107 (7 Cir. 1959), and more, encouraged or participated in it with a desire to forward it. United States v. Docherty, *supra,* 468 F.2d, at 992.

It is a judicial truism, moreover, that under Section 656, an intent to injure and defraud the bank is an essential element of the offense. See Evans v. United States, 153 U.S. 584, 592, 14 S.Ct. 934, 38 L.Ed. 830 (1894); United States v. Fortunato, 402 F.2d 79, 80 (2 Cir. 1968); Benchwick v. United States, 297 F.2d 330 (9 Cir. 1961); Seals v. United States, 221 F.2d 243 (8 Cir. 1955). See also United States v. Mullins, 355 F.2d 883 (7 Cir. 1966). Lastly, the mere existence of a "check kiting" scheme does not imply the intent required as a matter of law. Benchwick v. United States, *supra,* 297 F.2d, at 333, footnote 5; Dow v. United States, 82 F. 904, 908 (8 Cir. 1897). Specific intent must be proved in fact, but of course, circumstantial as well as direct evidence may be considered in determining whether the requisite intent has been proved.

We proceed to a brief analysis of the facts in the light of these applicable rules of law. Although there was no proof that the defendant or his brothers paid the Bankers Trust officers to com-

mit the violations, there is sufficient evidence that when the officers discovered the kiting operation, one of them consulted appellant about it, stated that it was wrong, and then failed to report the matter to his superiors, but allowed it to go on. The natural consequence of the connivance of the bank officers in the wrong was to put the bank in jeopardy of loss. Whether there was an actual purpose to injure the bank or not, there certainly emerged an intent to defraud the bank by "willfully misapplying the funds and credit of the bank." Without revealing the state of the Giordano accounts to their superiors the bank officers allowed the continuance of a course of kiting checks which could lead, as indeed it did, to ultimate loss for the bank. Nor was the kiting operation, conducted in such volume, a mere legitimate extension of overdraft credit to the customer. The bank manager and his assistant had no power to grant credit in an amount above $10,000, and the temporary overdrafts were in the hundreds of thousands. When a subordinate officer makes an unauthorized loan, he misapplies the funds of the bank. See Robinson v. United States, 30 F.2d 25, 27 (6 Cir. 1929).

The method of execution of the scheme itself showed an intent to defraud the bank. The checks deposited in the Giordano accounts, drawn on North America, were not listed on the deposit slips as "checks," but were regularly listed in the "cash" column of the deposit slip. The purpose of the misnomer was to conceal from the main office and the auditors that the kiting operation was going on. If the checks had been deposited as "checks" and their accounts credited immediately, they would have appeared on the Bankers Trust book balance of deposits, but would not have

been reflected on the "collected balance" which shows funds actually collected. Since the deposited checks were treated as "cash"—a collected item, there was no discrepancy between the "book balance" and the collected balance. The auditors would be led to think that cash had actually been deposited.[4]

Why the totalling of the actual cash deposited daily would not have caused suspicion we do not know. It appears at least that the lack of discrepancy in the Giordano accounts themselves was enough to fob off suspicion. The method used thus included acts of deception. On this record, intent to defraud is therefore as clear as the misapplication itself. See Robinson v. United States, *supra.*

Having concluded that there was sufficient evidence to establish the guilt of the bank officers, we turn to the knowledge and participation of Salvatore Giordano as an aider and abetter. It was he who opened the accounts. The deposits were made fairly equally into the Baywood Stables and Salvatore Giordano accounts. Deposits in the Bay Auto Sales account were made up of checks drawn fairly equally on the Baywood Stables and Salvatore Giordano accounts. The deposits and withdrawals were made continuously on a daily basis from January 1, 1967 to April 4, 1969.

Kamsler spoke to Salvatore Giordano about the account three times. The first time was when Kamsler discovered the unusual activity in the account in July 1967. He told Salvatore Giordano that "there was undue activity in the account which I felt was not justified . . . and it appeared that an illegal act was being committed, and as such that I should have reported it the minute I discovered it." Salvatore replied that "sometime in the future the prob-

---

4. To show that appellant had a right to assume that the procedure followed was routine, appellant offered a deposit slip, dated October 17, 1966, Exhibit K, to show that immediate crediting of checks deposited was the practice even before any allegedly sinister conversation with a bank officer took place. The difficulty is that Exhibit K shows the deposit under the column "checks" and not under "cash", which was the circumstance that tended to keep the nature of the transaction from detection by higher officials.

lem would be corrected and that nobody would be hurt, which included me." Again in 1968, Kamsler complained that if the condition was not corrected soon, he might lose his job. Salvatore said the situation would be cleared up "eventually." Late in 1968 or early 1969, Kamsler again warned Salvatore.

After each of these conversations, appellant continued to kite checks in large amounts, knowing that the bank official had told him that the practice was illegal and that the officer was likely to lose his job if it was discovered. The continued use of the method, in the light of the knowledge imparted, was an active participation in the willful misapplication by the bank officer. It could fairly be inferred that the cashing of checks, while the simultaneous deposits and withdrawals were going on, was to the detriment of the bank and was done with the improper connivance of the bank officer, who, knowing the circumstances, nevertheless gave his approval. The defense that appellant thought the procedure was routine is utterly inconsistent with Kamsler's testimony which the jury could believe.

The activities of appellant when the scheme was exposed by the contretemps of March 28, 1969 are revealing. When on March 28, 1969, the deposit slips were not picked up for delivery to the bank's central accounting division, the jig was up. The Giordanos had drawn checks against the deposited checks, but the deposits had not been reflected because of the error in a failure to deliver the deposit slips. When the checks drawn on North America in the amount of about $440,000 were presented to Bankers Trust for payment, the Giordano accounts lacked sufficient funds, because the day's deposits had not been reflected in the accounts, and Bankers Trust accordingly refused to honor

them. The checks were honored only after at least $440,000 of checks drawn on North America were deposited in Bankers Trust purportedly to cover. The checks were treated as "cash."

North America, in the meantime, had sensed a danger signal, and the next time the Giordanos tried to deposit checks drawn on Bankers Trust, North America insisted that they be certified. On April 1, 1969, four checks, each in the sum of $110,000, signed by appellant and drawn on the Baywood Stables and Salvatore Giordano accounts at Bankers Trust were presented for certification. Appellant knew that there were insufficient funds in the accounts and that Shaughnessy knew it. Shaughnessy certified the checks, and on inquiry about the certification from North America, Kamsler told them that the checks had been certified, even though he knew there was no good money in the accounts.

■ We are convinced that this recital meets the sufficiency of evidence standard we have described above.

## II

Appellant also contends that the evidence upon which the conviction of appellant depends was insufficient to prove a violation of 18 U.S.C. § 1004. Section 1004 is set forth in footnote two.

This section has apparently not been the subject of appellate review. The government contends that there is no requirement of specific intent to injure or defraud the bank to violate Section 1004, because it contains no words to that end. The government contrasts Section 1004 with Section 1005 which, in connection with false entries in books of a bank does require that the entry be made "with intent to injure or defraud such bank." It argues that the omission was not legislative oversight. We agree.[5]

---

5. The predecessors of 18 U.S.C. § 1004 never contained language requiring "an intent to injure or defraud such bank" (Act of July 12, 1882, c. 290 § 13, 22 Stat. 166; Act of Sept. 26, 1918, c. 177 § 7, 40 Stat. 972; Act of Feb. 25, 1927, c. 191, § 12, 44 Stat. 1231), nor did the section as earlier codified,

12 U.S.C. § 591 (1940). Although the statute formerly required specifically that the bank employee violate the statute "willfully," we take the same standard to be applicable to the present wording: "in order to evade any of the provisions of law relating to certification of checks."

The bank would be caused loss by the improper certification itself (3 U.C.C. 411; 12 U.S.C. § 501). The violation described, if willfully done, is, by definition, done with an intent to defraud. The act is a single act which, from its nature would be willfully committed only by a conscious wrongdoer. We think that proof of a willful certification with actual knowledge that funds are not in hand to meet the check is enough without independent proof of intent to defraud the bank.

Our review of the evidence convinces us further that appellant, as an aider and abetter, was essentially continuing his course of criminal conduct when he tendered the checks for certification in the hope that the scheme, on the most favorable view a scheme to obtain unauthorized loans without interest, would thus not be aborted.

### III

Appellant next addresses himself to alleged errors in Judge Dooling's charge.

Appellant attacks Judge Dooling's charge on his asserted failure properly to define the elements of the crime. We think appellant is right when he points out that an essential element of the offense under Section 656 is an intent to injure or defraud the bank. United States v. Docherty, *supra*, 468 F.2d, at 994–995. We think he is wrong when he contends that Judge Dooling's charge failed to embrace this element.

The judge charged with respect to the intent required for Kamsler and Shaughnessy's willful misapplication of bank funds that "[either] or both of them *knew* that such application of the bank funds exposed it to the risk of losing the funds so applied and *concealed* the existence of the transaction by crediting uncollected Bay Auto Sales checks to the Giordano and Baywood Stables accounts in such a way that they appeared to be deposits of currency and not deposits of uncollected checks" (Emphasis supplied). He did not use the words "intent to injure or defraud the bank" in describing an essential element of the offense. It is common ground, as we have seen, that although since the recodification of 1948, the present Section 656 no longer contains the specific requirement of intent to defraud the bank, that requirement has nevertheless been imported into the present section by judicial construction. See United States v. Docherty, *supra*, 994–995. The question remains whether the paraphrase of the trial judge equates the essential requirement. If the dominant purpose required for the offense is an actual intent to defraud the bank, as in embezzlement, then the instruction here may have fallen short. But if the element of intent in the willful misapplication of funds is satisfied by proving that the natural result of the unlawful act is likely to injure the bank, Judge Dooling's phraseology is more than adequate. Simply to tell the jury that "intent to defraud the bank" is required is to leave unexplained this very distinction.

We think that the combination of elements in the instruction (1) that the bank officers *knew* that the misapplication exposed the bank to the risk of losing its funds and (2) that they *concealed* the misapplication, sufficiently explicates the intent required.

As Judge Friendly noted in *Docherty,* supra, convictions for willful misapplication have involved iniquity or "foreseeable loss." (at 994). In Golden v. United States, 318 F.2d 357, 361 (1 Cir. 1963), in a prosecution under Section 656, the First Circuit sustained a charge that "[t]he intent to injure or defraud must not necessarily have been the purpose of the doing of the act, as long as the natural result of that conduct would be to injure or defraud the bank." And the Sixth Circuit in Galbreath v. United States, 257 F. 648, 656 (1918), in a similar prosecution held that "[a] wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank. Such is the well-settled law."

334

The purpose of a jury instruction is to instruct. Sometimes the literal repetition of the words of statute or opinion tends to confuse rather than enlighten. Judge Dooling made the jury understand what we conceive to be the quintessence of the requirement of intent. He was under no duty to recite a formula which, without the very explanation given, might have misled the jurors.

We have examined the other objections to the charge and find them to be without merit.

Affirmed.