**UNITED STATES of America, Appellee,**

v.

**Robert GREGG, Appellant.**

**No. 689, Docket 78–1407.**

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1979.

Decided Nov. 26, 1979.

Jonathan J. Silbermann, New York City (Federal Defender Services Unit, The Legal Aid Society, New York City, on the brief), for appellant.

Dominic F. Amorosa, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., and Richard D. Weinberg, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FEINBERG, TIMBERS and MES-KILL, Circuit Judges.

TIMBERS, Circuit Judge:

This is an appeal from a judgment entered after a jury trial in the Southern District of New York, Charles S. Haight, Jr., *District Judge*, convicting appellant of conspiring with, and aiding and abetting, others who embezzled, stole and misapplied funds of REA Express, Inc.

Two questions are presented on appeal: (1) whether the district court erred in declining to charge the jury that, in order to convict appellant of aiding and abetting, they must find that he knew of the position held by his co-defendant Bates at REA; and (2) whether the district court erred in its charge to the jury on the issue of intent.

For the reasons below, we hold that the district court's instructions on both issues were correct. We affirm.

I.

On June 28, 1978, an indictment was returned charging appellant Robert Gregg and four others[1] with conspiracy, aiding and abetting and substantive violations of the statute which prohibits thefts from interstate carriers. 18 U.S.C. § 660 (1976). The first count charged all defendants with conspiracy to embezzle, steal and misapply funds of REA Express, Inc. ("REA"), in violation of 18 U.S.C. § 371 (1976). Counts Two, Three, and Four, respectively, charged Gregg with aiding and abetting the embezzlement, stealing, and misapplication of REA funds in the amounts of $7,861.42 on November 14, 1973, $12,884.69 on November 20, 1973, and $20,000 on January 25, 1974, in violation of 18 U.S.C. § 660 (1976).

Gregg and one co-defendant, Rayburn L. Morrison,[2] were brought to trial on September 18, 1978. At the trial evidence was adduced from which the jury could have found as follows.

In early November 1973, Raymond F. Maixner, Treasurer of REA, Harold D. Bates, Manager of REA's Accounting Department, and Ali Jakubowsky, Director of Taxation for REA, met in REA's corporate headquarters in Manhattan. At this meeting they formulated a scheme whereby they would steal REA funds through the tax

---

1. In addition to charging Gregg with aiding and abetting, Counts Two, Three and Four of the indictment charged Harold D. Bates, Manager of the corporate Accounting Department at REA, and Raymond F. Maixner, Treasurer of REA, as principals responsible for stealing funds from REA. Count Five also charged the latter two defendants as principals with stealing REA funds, and charged Rayburn L. Morri-son with aiding and abetting that theft. Ralph Bates, Harold Bates' brother, was named as a defendant in the conspiracy count, but the charge as to him was severed and subsequently was dismissed.

2. Prior to trial, Maixner and Harold Bates entered guilty pleas to the conspiracy count and testified for the government at trial.

department. Pursuant to the scheme REA checks would be made payable to someone outside of REA; that person would agree to cash the checks, keep a percentage of the stolen funds and return the balance to the other conspirators.

In furtherance of this scheme, Bates contacted Gregg, whom he had known for several years and who then was living in Florida. Bates asked Gregg if he would be willing to "wash" some REA checks made payable to Gregg in return for 10% of the proceeds. Gregg said he would. In a subsequent telephone conversation, Bates told Gregg that the REA checks made payable to Gregg would be shown in REA's records as payments relating to REA's tax department and that a letter would be written by Jakubowsky explaining that Gregg was "our tax person within the Miami, Florida area." Bates testified that he assured Gregg that there was no need for concern about the scheme. Bates told Gregg:

> "[Y]ou know, we are going to be doing something that is not legal, but there's no reason . . . to worry about [it] for the simple reason that the people that are with me doing this . . . we control all the paperwork . . . ."

The first transaction pursuant to this scheme took place on November 14, 1973 when Bates, Maixner, and Jakubowsky processed an REA check payable to Gregg in amount of $7,861.42. The check was entered in REA's records as a payment relating to tax matters. Gregg, after receiving the check, deposited it in a joint checking account in the name of himself and Bates at the Capital Bank in Miami. Similar transactions involving $12,884.69 and $20,000 checks took place on November 20, 1973 and January 20, 1974, respectively.

After depositing the checks in the joint account, Gregg drew checks payable to Bates for approximately 90% of the total. Bates then divided his proceeds of the checks three ways—with Maixner, Jakubowsky and himself.[3]

At the conclusion of the three day trial, the district judge charged the jury that, with respect to the substantive counts, they need not find that Gregg was aware of Bates' position at REA in order to convict. Although Gregg's counsel failed to object to this portion of the charge at the time, his co-defendant Morrison did object. The judge declined to change the charge.

Gregg's counsel requested the judge to charge the jury that, in order to convict on the crimes charged, the government must prove specific intent. He submitted a proposed instruction on this issue which the judge declined to give in the form submitted.

The jury returned a verdict on September 25, 1978 convicting Gregg on each of the four counts in which he was named.[4] He was sentenced on November 14, 1978. From that judgment of conviction, he now appeals.

## II.

In the light of these facts and prior proceedings, we turn first to the question whether the district court properly charged the jury that, in order to convict appellant on the aiding and abetting counts, it was not necessary for the jury to find that appellant was aware of Bates' position at REA. We hold that the charge in this respect was proper.

Under 18 U.S.C. § 660 (1976), in order for a person to be charged as a *principal,* he

3. An entirely separate, but similar, transaction involving Harold Bates and Rayburn Morrison took place in early April 1974. Gregg was not involved in this transaction.

Morrison was Ralph Bates' superior at a real estate agency in Canyon Lakes, California. In early April 1974, Harold Bates visited his brother Ralph and was introduced to Morrison. Harold Bates offered Morrison a deal similar to those with Gregg. In return for accepting an REA check, Morrison would be given 10%. Morrison agreed. Upon his return to New York, Harold Bates and his co-conspirators processed a $31,300 check to Morrison. Although unable to cash it, Morrison agreed to, and did, purchase three cashier's checks with the proceeds, minus his 10%.

4. The jury acquitted the co-defendant Morrison on all counts in which he was named.

must hold the position of president, director, officer, or manager of a carrier engaged in interstate commerce. Section 660 in relevant part provides:

"Whoever, being a president, director, officer, or manager of any firm, association, or corporation engaged in commerce as a common carrier, . . . embezzles, steals, abstracts, or willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, securities, property, or assets of such firm, association, or corporation arising or accruing from, or used in, such commerce, in whole or in part, or willfully or knowingly converts the same to his own use or to the use of another, shall be fined not more than $5,000 or imprisoned not more than ten years, or both." 18 U.S.C. § 660 (1976).

The district court properly instructed the jury that, before they could find defendants guilty of aiding and abetting, at least one of the officials at REA—Bates, Maixner, or Jakubowsky—must be found guilty of the underlying offense. The court summarized its charge in this respect as follows:

"In short, one cannot be found guilty of aiding and abetting an official of a carrier if the official is himself not guilty of the underlying offense. With respect to this, you may consider the testimony of both Bates and Maixner wherein they admit their guilt.

*It is not required in order to find Mr. Gregg or Morrison guilty of aiding and abetting that you find that they knew Mr. Bates was the manager of REA.* It

is sufficient if you find under the instructions that I have given you that he aided and abetted Bates in Bates' theft of moneys from REA." (emphasis added).

 It is the last paragraph of the charge set forth above which appellant challenges on appeal, although he did not object to it at trial.[5] He contends that an essential element of the crime of aiding and abetting a violation of § 660 is that the aider and abettor *know* that the principal holds one of the specified positions in the company. In declining to change the charge in this respect in response to the objection by appellant's co-defendant, the court stated:

"[T]he existence of the crime does not depend upon their knowledge of Bates' status. The existence of the crime depends upon Bates' status . . . .

That establishes the crime and I think that one can be an aider and abettor knowing of the criminal act and acting in such a manner as to further it without being necessary that the aider and abettor have complete and full independent knowledge of the existence of all of the elements necessary to establish the substantive crime."

This issue, raised in the context of § 660, appears to be one of first impression. No case has been brought to our attention which deals directly with the issue. Appellant cites as support for his position *United States v. Northway*, 120 U.S. 327 (1887), a case which dealt with the similarly worded bank embezzlement statute,[6] now 18 U.S.C.

---

5. The government correctly points out that, while Gregg's co-defendant objected to this portion of the charge, Gregg failed to object to it at the time of trial. Under Fed.R.Crim.P. 30, "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires . . . ." While it certainly would have been better—and safer—practice for trial counsel to have preserved his claim of error by making a timely objection as required by Rule 30, we nevertheless shall treat the claim as cognizable on appeal; for, if appellant is correct that knowledge of the principal's position is an element of aiding and abetting under § 660, then failure to so charge would be regarded as plain error.

6. 18 U.S.C. § 656 (1976) in relevant part provides:

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, em-

§ 656 (1976). In *Northway*, the defendants, president of the Second National Bank of Jefferson and a cashier of the bank, sought to quash an indictment as insufficient to charge a federal offense under § 5209 of the Revised Statutes. That portion of the indictment which charged the president with aiding and abetting the cashier's misapplication of bank funds was challenged on the ground that the indictment failed to charge that the president knew the official relationship of the cashier to the bank. As to this, the Court held:

"The fourth question is whether it is necessary, in charging the defendant with aiding and abetting Sylvester T. Fuller, the cashier of the bank, with the misapplication of its funds, to charge that the defendant then and there knew that said Fuller was such cashier. We answer this question in the negative. . . . We do not think it is necessary, in an indictment for this offence, to charge any *scienter* more distinctly. The acts charged against Fuller could only be committed by him by virtue of his official relation to the bank. . . . The knowledge that each had of the official relation of the other is necessarily implied in the coexistence of this official relation on the part of both towards the same corporation." 120 U.S. at 333.

■ Appellant contends that *Northway* "clearly implied" that such an element ultimately would be necessary for conviction. We disagree. Close examination of the holding indicates that it supports the government's position, not that of appellant. Since essential elements of a crime should be alleged in an indictment, Fed.R. Crim.P. 7(c); *United States v. Tramunti*, 513 F.2d 1087 (2 Cir.), *cert. denied*, 423 U.S. 832 (1975), *Northway*, properly read, supports the proposition that under the banking statute an aider and abettor need *not* know that the principal is an official. Since such knowledge is not an essential element of aiding and abetting, it has no place in a charge to the jury.

Since *Northway* is almost a century old, and somewhat cryptic, we do not rest our holding on it alone. The trend of recent cases involving crimes defined in terms of the status of either a participant or the victim has been away from requiring knowledge of that status by one accused of aiding and abetting or of conspiring. *E. g., United States v. Feola*, 420 U.S. 671 (1975). In *Feola*, the Supreme Court considered the question whether under 18 U.S.C. § 111 a defendant must have specific intent to assault a federal officer in order to be convicted either of the substantive offense or of conspiracy. In resolving the question, the Court considered the legislative purpose behind the statute to determine whether Congress could have intended to condition liability on the actor's awareness of the identity of the victim. 420 U.S. at 682. The Court concluded that the "federal officer" requirement was "jurisdictional" only:

"The significance of labeling a statutory requirement as 'jurisdictional' is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute. The question, then, is not whether the requirement is jurisdictional, but whether it is jurisdictional only." *Id.* at 676–77 n. 9.

■ Appellant argues that the jurisdictional predicate of § 660 is merely that the carrier be involved in interstate commerce and that the statutory requirement limiting application of the statute to a "president, director, officer, or manager" was designed as a substantive restriction on the federal law. We find this argument unpersuasive. It is contrary to the legislative history relating to the predecessor of § 660.

One of the major concerns of several senators at the time of the enactment of the original statute was whether the proposed

---

ployee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years or both; but if the amount embezzled, abstract-

ed, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

legislation was beyond the jurisdiction of the federal government and therefore an unconstitutional encroachment on the police power of the states. 51 Cong.Rec. 14035–41 (1914). Serious questions were raised as to whether interstate commerce was a sufficient predicate for such a statute. *Id.* at 14036. Indeed, one senator inquired whether Congress could make it a federal offense to commit larceny against the property of the United States Steel Corporation; another responded that, unless the property was in the process of being transported from one state to another, Congress was without constitutional power to enact such legislation. *Id.*

Although Senator Chilton, the sponsor of the bill, explained that Congress clearly had the power to regulate commerce between the states as well as to regulate common carriers engaged in transporting goods interstate, *id.* at 14038, the statutory language demonstrates that Congress chose not to impose liability on anyone who embezzles from a carrier engaged in some form of interstate commerce. Instead, the statute is limited in application to high corporate officials who have greater access to the funds of interstate carriers and to policy decisions involving interstate carriers and to employees "riding in or upon any . . . vehicle of such carrier *moving in interstate commerce* . . . ." 18 U.S.C. § 660 (1976) (emphasis added).

It is this latter portion of the statute which belies appellant's arguments that the involvement of the company in interstate commerce alone is the jurisdictional predicate for the statute. As the Ninth Circuit explained in *Shaver v. United States*, 174 F.2d 618, 619 (9 Cir. 1949), Congress could have made the statute applicable to *any* employee who converts the funds of an interstate carrier even though, at the time of the employee's involvement in the conversion, the property which once had moved in interstate commerce had ceased to move interstate and was simply being transported within a single state. The statute, however, requires that, before an employee's action may constitute a federal offense, the employee must be "riding on a vehicle of the carrier, that the vehicle be moving in interstate commerce, or that the vehicle be transporting property in interstate commerce *at the time appellant had funds* arising out of such transportation and *converted such funds* to his own use." *Id.* at 619 (emphasis added). Since the employee in *Shaver* simply had transported goods in and about San Francisco, and had embezzled funds from the company arising from such transportation, the Ninth Circuit dismissed the indictment on the ground that, while the goods had originated in another state, the defendant had not been "riding" in interstate commerce at the time of the theft. Although the court did not specifically hold that the requirement was "jurisdictional", it is clear from the legislative history that this requirement was inserted in the statute to assure that interstate commerce would be involved at the time of the embezzlement.

Similarly, we interpret the requirement at issue in the instant case to be jurisdictional. The purpose behind § 660 was to provide additional sanctions for thefts involving interstate carriers' funds—crimes which conceivably could have a profound effect on the efficient operation of the interstate commerce system in general. Unlike the average employee who would have little opportunity to divert large sums of money, the officials singled out by the statute—namely, those who hold the position of president, director, officer, or manager of a carrier—have a great deal of control over financial matters and policy decisions. Accordingly, they present a greater risk of affecting interstate commerce through schemes to embezzle or misapply funds. Like the requirement that an employee must be found to have embezzled funds while in the process of moving goods interstate before his action may constitute a federal offense, the requirement limiting violations of the statute to high corporate officers was designed to ensure that interstate commerce in fact was affected by the alleged violation.

Accordingly, we conclude that the requirement that the principal violator under

the statute hold the position of president, director, officer, or manager of the interstate carrier is jurisdictional only. Upon the authority of *Feola*, therefore, it was not essential that the court charge the jury that they must find that appellant knew of the status of the principal. As the Court stated in *Feola* :

> "This interpretation poses no risk of unfairness to defendants. It is no snare for the unsuspecting. . . . The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. . . . The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." 420 U.S. at 685.

Similarly, we note that appellant here was not engaged in legitimate conduct that was rendered unlawful "solely because of the identity of the individual" with whom he conspired. Hence, there is no element of unfairness in holding appellant liable for conduct which he knew to be illegal.[7]

Under all of the circumstances, we hold that the district court properly charged the jury that it was unnecessary for them to find that appellant knew Bates' position at REA.

### III.

Turning to the second question presented on appeal, appellant claims that the district court erred in its charge to the jury on the issue of defendant's *mens rea*. We hold that the charge clearly required the jury to find the requisite criminal intent and knowledge, and that the charge, read as a whole, was eminently fair and balanced.

Counsel for appellant requested the court to instruct the jury that, to convict appellant of the crimes charged, the government was required to prove specific intent, and that "[t]o establish specific intent the government must prove that the defendant knowingly did the acts which the law forbids intending to violate the law." The court refused to charge in the language requested.

 The statutory language "willfully misapplies" and "willfully permits to be misapplied" indicates that specific intent must be proven for conviction under § 660. *Glacy v. United States*, 361 F.2d 31, 32–33 n. 6 (1 Cir.), *cert. denied*, 385 U.S. 831 (1966). Indeed, we held that specific intent is a requisite element of the analogous crime of bank embezzlement and must be established by the government. *United States v. Giordano*, 489 F.2d 327, 330 (2 Cir. 1973); *United States v. Docherty*, 468 F.2d 989 (2 Cir. 1972). The specific intent required by *Giordano* and *Docherty*, however, is knowledge of and desire to assist the criminal activity of the principal and intent to injure or defraud. Although the charge given by the district court here did not include in haec verba the words "specific intent", we hold that the charge, read in its entirety, *Henderson v. Kibbe*, 431 U.S. 145, 152 (1977), was sufficient to instruct the jury as to the *mens rea* necessary for conviction.

With respect to the conspiracy count, the court instructed the jury that they must find that defendant participated in the conspiracy "with knowledge of at least some of its purposes and with intent to aid the accomplishment of its unlawful ends." The court defined knowingly and willfully as follows:

> "An act is done knowingly if it is done voluntarily and purposely and not because of mistake, accident, mere negligence or some other innocent reason. An act is done willfully if it is done knowingly and deliberately.
>
> Willful does not mean that the defendant in addition to knowing what he is

---

**7.** We also note that there was evidence that he in fact knew that the people with whom he was dealing were officers or managers of REA. On cross-examination, Bates testified that he told Gregg:

"I have the treasurer and the director of taxes behind us and we control all the paper work . . . so there is no problem as far as anybody finding this out."

doing must also suppose he is breaking the law. Ignorance of the law is no excuse.

. . . .

I reiterate, however, that in order to convict a defendant of conspiracy he must have knowledge of some of its purposes and he must act with the intent of accomplishing the objectives of the conspiracy."

Moreover, with respect to the aiding and abetting counts, the court charged that defendant "must not only know about the criminal nature of the other person's acts but [he must] share that evil purpose himself." We hold that these instructions, in the context of the charge as a whole, were correct. *United States v. Berger*, 433 F.2d 680, 684 (2 Cir. 1970), *cert. denied*, 401 U.S. 962 (1971). As Judge Learned Hand stated in *American Surety Co. of New York v. Sullivan*, 7 F.2d 605, 606 (2 Cir. 1925):

> "The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law."

Appellant has failed to cite any cases which hold that, in the light of the charge as a whole which was given here, he was entitled to the instruction in the language requested. In *United States v. Byrd*, 352 F.2d 570, 572 n. 1 (2 Cir. 1965), we held that "[t]he instruction that the jury must find that the defendant, in committing the act was aware that he was breaking the law was incorrect and over-generous to the defendant." Indeed, that portion of the instruction requested by appellant here requiring that appellant be shown to have "purposely [intended] to violate the law," might have misled the jury into believing that appellant must have been aware of the specific federal statute proscribing his conduct. It is well settled that ignorance of the law is no defense to purposeful and intentional action. *Lambert v. California*, 355 U.S. 225, 228 (1957).

We reaffirm our decisions in *Giordano* and *Docherty*. We hold that to establish the criminal intent necessary under § 660 requires a showing only that it be the defendant's conscious purpose to bring about the conduct proscribed by the statute, and not that the defendant also intended that his conduct be violative of the law. Read as a whole, the charge given by the district court here adequately instructed the jury in accordance with the proper standards.

Affirmed.