842 F.2d 333
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Alan MORGENSTERN and Frederick Earl Morgenstern,
Defendants-Appellants.
 Nos. 87-5447, 87-5548.
 United States Court of Appeals, Sixth Circuit.
 March 17, 1988.
 
 Before LIVELY, Chief Judge, NATHANIEL R. JONES and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 David A. Morgenstern and Frederick E. Morgenstern were convicted after a jury trial of ten counts of willfully causing to be misapplied more than seven million dollars of the moneys, funds and credits of the Claiborne County Bank in Tazewell, Tennessee, with intent to injure or defraud the bank, in violation of 18 U.S.C. Secs. 656 and 2 (1982), and ten counts of transporting or causing to be transported in interstate commerce securities having the value of more than $5,000, knowing them to have been stolen, converted or taken by fraud, in violation of 18 U.S.C. Secs. 2314 and 2 (1982). The defendants were also convicted of one count of conspiracy to commit these substantive offenses, in violation of 18 U.S.C. Sec. 371 (1982). After considering the Morgensterns' contentions for reversal, we affirm the convictions.
 
 
 2
 * The Morgensterns' principal contention on appeal is that there was insufficient evidence to convict them of the crimes charged. In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The government must be given the benefit of all inferences which can reasonably be drawn from the evidence. United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984) (and cases cited therein), cert. denied sub nom. Freeman v. United States, 469 U.S. 1193 (1985). "Circumstantial evidence is intrinsically as probative as direct evidence and may be the sole support for a conviction." United States v. Newton, 756 F.2d 53, 54 (8th Cir.1985).
 
 
 3
 At the center of this case is the Claiborne County Bank located in Tazewell, Tennessee.[1] According to its president, Robert Barger, the bank is a small, family-owned institution which is insured by the Federal Deposit Insurance Corporation. During the events in question, the bank's executive vice president and cashier was Ruth Bailey, a 37-year veteran of the institution. Bailey, a central figure in this case, held ten percent of the bank's stock and was one of its directors. She had authority to issue cashier's checks and wire transfers, but her loan authority was limited to $50,000.
 
 
 4
 Bailey first met the Morgensterns sometime in 1980. David and Fred Morgenstern were involved in various coal-related businesses, including the operation of mines in Kentucky and Tennessee. By January 1980, the Morgensterns' activities were operated through several corporations, including Resource Trade Corporation, Minerals and Resources Corporation, Transcoal Corporation and S.A.M. Corporation. Eventually, the defendants incorporated Financial Reserve Corporation, to integrate vertically all of the mining and processing functions into one company.
 
 
 5
 In early 1980, the Morgensterns moved most of their banking to the Claiborne County Bank, opening 21 accounts between March 1980 and February 1981. Ruth Bailey was in charge of the Morgensterns' accounts. At the time, the defendants informed the bank's officials that they would need to draw on uncollected funds; that is, they would need immediate credit for checks deposited in an account. The bank agreed and opened a special escrow account for uncollected checks. Any checks returned for uncollected funds were posted to this account.
 
 
 6
 In March 1980, the bank provided the Morgensterns with a $200,000 line of credit to cover uncollected funds. By the fall of 1980, however, the defendants' companies were having serious financial problems and the relationship with the bank began to sour. According to President Barger, there was a continuous problem of checks being returned because of uncollected funds. Consequently, on November 18, 1980, the bank decided that it would not allow the Morgensterns to draw on uncollected funds, unless there were sufficient funds in their accounts at the bank to cover the checks or there was verification that the checks were written on available funds.
 
 
 7
 Because, by the end of 1980, the Morgensterns' financial woes did not improve, Fred Morgenstern was forced to ask Ruth Bailey on four occasions for personal loans to meet the companies' payrolls. Between November and December 1980, Bailey personally loaned some $24,000, which was eventually repaid.
 
 
 8
 On January 12, 1981, the Morgensterns applied for a $960,000 loan from the bank. Their request was denied because, by this time, the defendants owed the bank some $364,000 due to uncollected checks. However, in February 1981, the bank did make a secured loan for $250,000.
 
 
 9
 In response to their continued need for funds, the Morgensterns devised a check-kiting scheme to defraud the bank of its funds. The check-kiting scheme was carried out during February 1981 and involved 21 bank accounts, eight of which were at the Claiborne County Bank. According to Danny Garnett, special agent for the Federal Bureau of Investigation, the Morgensterns had a beginning balance in these 21 accounts of $393,523. During February 1981, they also deposited $1,010,153 into these accounts from legitimate outside sources, including the $250,000 loan from the bank in February. They thus had a total of $1,403,676 in the 21 accounts. Garnett testified that, during this same period, the Morgensterns distributed the sum of $2,758,412 from these accounts to outside parties, such as creditors.
 
 
 10
 Based on the above figures, these accounts should have shown a debit, but they did not. The defendants were able to prevent this by causing Ruth Bailey to wire transfer $5,968,942 of the bank's own funds to the Morgensterns' accounts at the other banks. For example, between February 2-24, 1981, Bailey made 21 wire transfers for a total sum of $4,700,642 from the bank to a Morgenstern account at the Citizens Bank of Pikeville, in Pikeville, Kentucky. As payment for these wire transfers, the defendants generally gave Bailey checks written on their accounts at the bank; these checks were not covered by sufficient funds. In some instances, instead of checks, the Morgensterns had their accounts at the bank debited for the wire transfers.
 
 
 11
 During this series of transactions, David Morgenstern drew 22 checks totalling $4,744,387 from an account at the Citizens Bank of Pikeville and deposited them into the Resource Trade Corporation account at the Southeast Bank of Jacksonville, in Jacksonville, Florida. He then wrote checks on this Florida account and deposited them into the defendants' accounts at the Claiborne County Bank. Between February 20-28, 1981, David Morgenstern wrote 20 checks totalling approximately seven million dollars on the defendants' account at the Southeast Bank of Jacksonville and deposited them into the Claiborne County Bank.
 
 
 12
 Between February 10-26, 1981, the Morgensterns had Bailey issue to them 14 cashier's checks drawn on the bank's funds, totalling $4,440,275. According to Bailey, the Morgensterns needed these cashier's checks because they were experiencing financial problems, they had written more checks than they had funds to cover, and they were having problems clearing funds. Ten of these cashier's checks formed the basis for the counts in the indictment for which the defendants were convicted. The Morgensterns paid for these ten cashier's checks with checks drawn on accounts at the bank. Special Agent Garnett testified that there were insufficient funds in these accounts to cover these checks.
 
 
 13
 The Morgensterns deposited the cashier's checks in various banks in Florida and Georgia. Cashier's check No. 66184, dated February 23, 1981, is illustrative. This check for $100,000 was payable to Minerals and Resources Corporation. Issued in exchange for a check written on insufficient funds, it was deposited into a Morgenstern account at the Peachtree Bank in Chamblee, Georgia.
 
 
 14
 The Morgensterns' financial ventures began to crumble when the Claiborne County Bank sought payment from the Southeast Bank of Jacksonville for the seven million dollars worth of checks drawn on the latter bank. The Florida bank returned these checks as being written on uncollected funds. Claire Skidmore, of the Southeast Bank of Jacksonville, testified that if the checks had been returned again by the Tazewell bank, her bank would have refused to pay them.
 
 
 15
 Brenda Snodgrass, head bookkeeper of the Claiborne County Bank, first became aware of the returned checks around February 26, 1981. She testified that, as the checks were returned to the bank, she would check the Morgensterns' accounts to see what funds they had available to cover them. By March 4 or 5, 1981, the bank froze all of the defendants' accounts.
 
 
 16
 By the beginning of March 1981, the bank was on the verge of becoming insolvent due to the returned checks. Bailey was removed from her position with the bank, and Robert Barger took control of the accounts. The returned checks were posted to the escrow account, and the bank sought any available funds to offset the uncollected debt. Additionally, the Morgensterns began wiring funds and transmitting cashier's checks to the bank in an effort to offset uncollected items. After the bank took other curative measures to recoup its losses, including a fidelity bond claim on Ruth Bailey for $1,675,000, it lost approximately $2,220,621.
 
 
 17
 On February 6, 1986, a grand jury returned a twenty-nine count indictment against the Morgensterns and a third individual who was subsequently dismissed from the case. The indictment charged the defendants with causing the misapplication of funds of the Claiborne County Bank and the transportation of those misapplied funds in interstate commerce. The indictment also contained one count alleging a conspiracy to commit the above offenses.
 
 
 18
 After the government presented its case in chief, the defendants moved for judgment of acquittal on all counts. The district court granted the motion in part, dismissing counts 2 through 9. These counts concerned cashier's checks issued on February 10 and subsequently deposited at the Chemical Bank of New York. According to the district court, there was uncontroverted testimony that there were sufficient funds in the Morgensterns' accounts to pay for these particular cashier's checks. The court denied the motion on the remaining counts. Thereafter, the defendants rested without offering any evidence. The jury found the Morgensterns guilty of the remaining counts in the indictment.
 
 II
 
 19
 The Morgensterns primarily attack their convictions for causing the misapplication of bank funds, in violation of 18 U.S.C. Secs. 656 and 2 (1982). In order to convict the defendants under section 656, read in conjunction with section 2, the government must prove: 1) the bank is national in character; 2) Ruth Bailey is an officer, director, agent or employee of the bank; 3) the defendants willfully caused the misapplication of the bank's moneys, funds or credits; and 4) the defendants acted with intent to injure or defraud the bank. See United States v. Duncan, 598 F.2d 839, 858 (4th Cir.), cert. denied, 444 U.S. 871 (1979).
 
 
 20
 The Morgensterns contend initially that the evidence was insufficient to establish that they possessed the requisite intent to injure or defraud the bank. We disagree.
 
 
 21
 In order to convict a defendant for willfully causing the misapplication of bank funds with intent to injure or defraud, the government must prove that the defendant knowingly participated in a deceptive or fraudulent transaction. United States v. Adamson, 700 F.2d 953, 965 (5th Cir.) (en banc) (collecting cases), cert. denied, 464 U.S. 833 (1983). See also Logsdon v. United States, 253 F.2d 12, 15 (6th Cir.1958). "The trier of fact may infer the required intent, i.e., knowledge, from the defendant's reckless disregard of the interest of the bank...." Adamson, 700 F.2d at 953. See also United States v. Stozek, 783 F.2d 891, 893 (9th Cir.), cert. denied sub nom. Roberts v. United States, --- U.S. ----, 107 S.Ct. 284 (1986); United States v. Cooper, 577 F.2d 1079, 1083 (6th Cir.), cert. denied, 439 U.S. 868 (1978). The district court in this case properly instructed the jury on these principles.
 
 
 22
 We believe there was sufficient evidence for the jury to find that the Morgensterns had the requisite intent to defraud the bank. At the outset of the Morgensterns' relationship with the bank, they were allowed to draw on uncollected funds. By November 18, 1980, however, this practice was terminated because of a series of overdrafts that occurred. The Morgensterns were on notice that the bank had rescinded this privilege because there were insufficient funds in their accounts at the bank to cover the checks. Yet, the defendants continued to draw checks on their accounts at the bank without sufficient funds to cover them. From the number of checks drawn, and the large dollar amounts involved, the jury could infer not only that the Morgensterns could not pay for these checks, but that the defendants provided these checks as payment to the bank knowing they could not cover them.
 
 
 23
 Between February 10-26, 1981, although the defendants owed the bank for prior overdrafts, they had Ruth Bailey issue 14 cashier's checks to them, totalling over four million dollars. The defendants had insufficient funds in their accounts at the bank at this time to pay for these checks. Nevertheless, they drew checks from their accounts to pay for the cashier's checks.
 
 
 24
 In an attempt to inflate their accounts at the bank during this period, the Morgensterns deposited some seven million dollars in worthless checks from the Southeast Bank of Jacksonville. These checks were eventually returned to the bank unpaid, almost causing it to become insolvent.
 
 
 25
 From these set of facts, viewed in a light most favorable to the government, a rational jury could find beyond a reasonable doubt that the Morgensterns acted in reckless disregard of the bank's interest, and infer from such conduct an intent to injure or defraud the bank. See United States v. Giordano, 489 F.2d 327, 332 (2d Cir.1973). See also Benchwick v. United States, 297 F.2d 330, 333 (9th Cir.1961) ("The repeated drawing and payment of checks over an extended period in amounts grossly in excess of the defendant's balance was itself a relevant circumstance bearing upon defendant's knowledge and intent."); Logsdon, 253 F.2d at 15.
 
 
 26
 This is not a case, as suggested by the defendants, of a "mere legitimate extension of overdraft credit to the customer." Giordano, 489 F.2d at 331. As noted, several months before the cashier's checks were requested, the bank had rescinded the privilege of allowing immediate credit for checks deposited in an account. Moreover, Ruth Bailey's loan authority was limited to $50,000 and the overdrafts caused by the cashier's checks greatly exceeded that amount. See id. This is a case where the defendants profited from a substantial overdraft, in effect giving themselves free use of the bank's funds, without having any assurance that they would be able to pay for the cashier's checks they were receiving, even in the future. See Stozek, 783 F.2d at 893.
 
 
 27
 We also reject the defendants' contention that the evidence was insufficient to establish a misapplication of bank funds. To show a misapplication, the government must prove a conversion of bank funds to the use of the defendants or a third party. Duncan, 598 F.2d at 858. See also United States v. Krepps, 605 F.2d 101, 103 (3d Cir.1979). Although the term "misapplication" has been construed in many different contexts, see Krepps, 605 F.2d at 104 & n. 13 (citations omitted), it will suffice to say here that a misapplication is shown when "the defendant at least temporarily deprive[s] the bank of the possession, control, or use of its funds." Duncan, 598 F.2d at 858. In this case, the defendants caused the misapplication of bank funds when they had Ruth Bailey issue some four million dollars worth of cashier's checks in exchange for worthless checks drawn on their accounts at the bank. See Benchwick, 297 F.2d at 334.
 
 
 28
 Finally, we find no merit to the Morgensterns' contention that the evidence was insufficient to establish that the defendants "caused" Bailey to misapply funds of the bank. Pursuant to 18 U.S.C. Sec. 2(b), under which the defendants were charged, they could be convicted as causers, even though they were not legally capable of personally committing the act forbidden by the federal statute and even though the agent willfully caused to do the criminal act (Ruth Bailey) was herself guiltless of the crime. United States v. Keefer, 799 F.2d 1115 (6th Cir.1986); United States v. Ruffin, 613 F.2d 408 (2d Cir.1979); United States v. Lester, 363 F.2d 68 (6th Cir.1966), cert. denied, 385 U.S. 1002 (1967).
 
 
 29
 Although the Morgensterns did not qualify as "an officer, director, agent or employee of" the Claiborne County Bank, as contemplated by 18 U.S.C. Sec. 656 (1982), the jury could find that they adopted Ruth Bailey's acts and capacity by causing this "innocent intermediary to commit a criminal act." Ruffin, 613 F.2d at 415.
 
 
 30
 The Morgensterns argue that Ruth Bailey did not rely on any fraudulent conduct in issuing the cashier's checks; that she would have issued those checks "of her own volition" whether or not the defendants engaged in such conduct. The only support for this assertion is Bailey's own vague testimony, which the jury was entitled to find inherently incredible. We reject this contention because there was "abundant proof from which the jury could conclude that [the defendants] caused [Bailey] to pay out the bank's monies improperly on the basis of the bogus checks." United States v. Sliker, 751 F.2d 477, 494 (2d Cir.1984), cert. denied sub nom. Buchwald v. United States, 470 U.S. 1058 (1985).
 
 
 31
 For the foregoing reasons, we also find no merit to the defendants' contentions that there was insufficient evidence to convict them of the conspiracy count and the interstate transportation counts.
 
 III
 
 32
 Next, the Morgensterns contend that the district court improperly refused to charge the jury as follows:
 
 
 33
 Although several checks of the defendants were returned uncollected, that course of conduct did not involve the making of a false or fraudulent representation. A check is not a factual assertion and cannot be characterized as true or false. Defendants' bank checks served only to direct the drawee bank to pay the face amount to the bearer while committing the defendants to make good the obligation if the bank dishonored the drafts. Each check did not make any representations as to the statement of the defendants' bank balance.
 
 
 34
 The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury. United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984). A trial court does not err when it refuses to use language contained in a jury request, as long as the charge given is accurate and sufficient. Ibid.
 
 
 35
 The Morgensterns based their requested charge on Williams v. United States, 458 U.S. 279 (1982). There, the Supreme Court addressed whether the deposit of a "bad check" in a federally insured bank was proscribed by 18 U.S.C. Sec. 1014 (1982), which makes it a crime to "knowingly make any false statement" for the purpose of influencing certain enumerated financial institutions. Although the defendant in Williams deposited checks that were not supported by sufficient funds, the Court held that that course of conduct did not involve the making of a false statement. The Court said:
 
 
 36
 [T]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance.
 
 
 37
 However, the Court carefully limited its analysis to the passing of a single check backed by insufficient funds, and did not address a scheme to pass a series of bad checks in an attempt to defraud a bank. See id. at 287 ("Indeed, each individual count of the indictment in this case stated only that petitioner knowingly had deposited a single check that was supported by insufficient funds, not that he had engaged in an extended scheme to obtain credit fraudulently."). The Court drew "a qualitative distinction between an individual bad check and a 'scheme to pass a number of bad checks,' implying that a deliberate plan to deceive through submitting checks backed by insufficient funds is not the same sort of crime as merely passing a single bad check." United States v. Rafsky, 803 F.2d 105, 107 (3d Cir.1986) (citation and footnote omitted), cert. denied, --- U.S. ----, 107 S.Ct. 1568 (1987). As the Third Circuit noted in Rafsky, 803 F.2d at 108, "a scheme to defraud based on a check kiting scheme is distinguishable from a misrepresentation involving a single check drawn on insufficient funds." From the foregoing, it is clear that the district court did not err in refusing the requested instruction.
 
 
 38
 Even assuming arguendo, contrary to Rafsky, that a scheme to pass a number of bad checks would fall within the ambit of Williams, the defendants would still not prevail. The government pursued this case under 18 U.S.C. Sec. 656 which, unlike the statute at issue in Williams, does not require the making of a "false statement." The focus of this case was not on whether the Morgensterns had made a false statement to the bank, but whether the jury could infer from the issuance of a series of bad checks that the defendants had intended to defraud the bank of its funds. Thus, the Williams charge is inapplicable. The court's instruction stated the law correctly and adequately submitted the issues to the jury.
 
 IV
 
 39
 The Morgensterns contend that the absence of any mention of check kiting in the indictment violated their sixth amendment right to be informed of the nature and cause of the accusations against them. We disagree. The defendants were not charged with check kiting, but with causing the misapplication of bank funds and the interstate transportation of those funds. The indictment in this case presented the defendants with more than adequate notice of the charges against them. The conspiracy count identified the principal co-conspirators and described in detail the banking transactions giving rise to this count. The same is true for the misapplication and interstate transportation counts. In addition, the indictment generally included the elements of the offense. Hamling v. United States, 418 U.S. 87 (1974). See also Lincoln v. Sunn, 807 F.2d 805, 812 (9th Cir.1987) ("By including the elements of the offense, an indictment informs the defendant of the charge against him.").
 
 
 40
 We also reject the Morgensterns' contention that the indictment should have included "many of the wire transfers, deposits and other bank activity which [were] allegedly part of the scheme." Although the defendants are entitled to a "plain concise statement of the essential facts constituting the offenses charged, the indictment need not provide ... the evidentiary details by which the government plans to establish ... guilt." United States v. Gordon, 780 F.2d 1165, 1171-72 (5th Cir.1986).
 
 
 41
 Finally, the Morgensterns contend that the evidence of the alleged check-kiting scheme created a fatal variance between the indictment and the proof at trial. Shortly before trial, the government filed a memorandum indicating its intention to introduce at trial overt acts, in furtherance of the conspiracy, that were not alleged in the indictment. The memorandum indicated that the overt acts involved "wire transfers, checks and bank statements." The defendants objected to the admission of such acts, and the court reserved ruling on the issue. The evidence was subsequently admitted at trial.
 
 
 42
 A variance occurs when the charging terms of the indictment are left unaltered but the evidence offered at trial proves materially different from those alleged in the indictment." United States v. Bouquett, 820 F.2d 165, 168 (6th Cir.1987). A variance will result in reversal only if the defendant's substantial rights have been affected. Ibid. "Substantial rights are affected only when a defendant proves prejudice to his ability to defend himself, to the overall fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." Ibid. The burden is on the defendant to prove that a variance affects substantial rights. Ibid.
 
 
 43
 This contention is without merit because much of the evidence of the alleged check-kiting scheme was relevant to show the defendants' intent to defraud the bank. Moreover, the Morgensterns were charged with a conspiracy. "Since the government is not limited to overt acts pleaded in the indictment in proving a conspiracy, but may show other acts of conspirators occurring during its life," the evidence of the alleged check-kiting scheme was admissible. United States v. Carlock, 806 F.2d 535, 550 (5th Cir.1986) (citation omitted), cert. denied, --- U.S. ----, 107 S.Ct. 1611 (1987).
 
 
 44
 Finding no merit to the defendants' contentions, we AFFIRM their convictions.
 
 
 
 [1]
 We shall refer to the Claiborne County Bank as "the bank."