UNITED STATES, Appellee,

v.

Pedro BENAVENTE GOMEZ,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Guillermo CERDA RODRIGUEZ,
Defendant, Appellant.

UNITED STATES,

v.

Pedro BENAVENTE GOMEZ,
Defendant, Appellant.

Nos. 89–1291, 89–1459 and 90–1342.

United States Court of Appeals,
First Circuit.

Heard Sept. 10, 1990.

Decided Dec. 20, 1990.

Stephen M. Klimacek with whom Adorno & Zeder and Fred A. Schwartz, Coconut Grove, Fla., were on brief for defendant, appellant Guillermo Cerda Rodriguez.

Miriam Ramos–Grateroles, Bayamon, P.R., by appointment of the Court, for defendant, appellant Pedro Pablo Benavente–Gomez.

Juan A. Pedrosa with whom Daniel F. Lopez–Romo, U.S. Atty. and Jose A. Quiles, Hato Rey, P.R., Asst. U.S. Atty., were on brief for the U.S.

Before CAMPBELL and CYR, Circuit Judges, and COFFIN, Senior Circuit Judge.

COFFIN, Senior Circuit Judge.

Pedro Pablo Benavente Gomez and Guillermo Cerda Rodriguez were convicted of conspiring to import nearly 5000 grams of cocaine into the United States in violation of 21 U.S.C. § 963. Cerda also was convicted on the underlying crimes of importation of cocaine and use of a communication facility to import cocaine. *See* 21 U.S.C. §§ 952(a), 843(b). On appeal, defendant Benavente claims there was insufficient evidence to support the verdict against him. He also argues that the district court erred in denying him a new trial based on newly discovered evidence. Defendant Cerda argues that certain evidence was improperly admitted against him. We reject each of

these arguments and affirm the convictions.

## I. FACTS

On June 20, 1988, Bobby Joel Sivils [1] entered Puerto Rico on his way to Miami from Venezuela. He was detained at customs and investigation revealed that he was carrying substantial amounts of cocaine concealed in a briefcase, two portfolios and a book. Sivils agreed to cooperate with United States Drug Enforcement Agency ("DEA") agents.

In the presence of the agents, Sivils placed four monitored telephone calls to defendant Cerda in Miami during the evening of June 20 and the following morning. In the first call, Sivils spoke with Cerda's girlfriend, Angie, who told him to call Cerda when he arrived in Miami and they would pick him up. Sivils continued to try to reach Cerda and finally spoke with him at 9:00 the following morning. Sivils informed Cerda that he had received the "computer parts" from "Ruth" and that he planned to catch the 1:00 or 4:00 flight out of Puerto Rico. He told Cerda he would call him when he arrived. Cerda agreed.

Sivils arrived in Miami on the morning of June 22 and went to a hotel. He called Cerda several times between 10:15 and 11:30. During these calls, Cerda told Sivils that he had received a call from Sivils' girlfriend, who told him that Sivils had run into some problem in Puerto Rico. Sivils assured Cerda that he was in no trouble. Cerda told Sivils he would come over.

Shortly thereafter, around noon, Sivils received a call from Angie, asking him to come down to the lobby. When he arrived at the lobby, Sivils met not Cerda, but Angie and defendant Benavente. After a few minutes, Sivils returned to his room and called Cerda. Cerda told him he was taking a shower and that he would join them shortly. Sivils returned downstairs to Angie and Benavente. The three conversed for over three hours in the bar. Sivils testified that, during the course of the conversation, Benavente and Angie felt

1. At various points in the record, the name also is spelled "Sivil," "Sybil" and "Sybils."

his legs and that he assumed they were checking to see if he was carrying a transmitter.

Sometime after 3:00, Benavente and Sivils went up to Sivils' room to call Cerda. Benavente gave Cerda's business telephone number to Sivils. Not reaching Cerda, Sivils left a message and Cerda returned the call in a few minutes, suggesting that they meet at his office. Benavente and Sivils returned to the bar, where Sivils told Angie and Benavente that he intended to stay at the hotel. Angie and Benavente then left the hotel. Surveillance agents observed them travel to Cerda's place of business, where they met with Cerda for about fifteen minutes.

At about 5:00, Cerda called Sivils and told him he was coming by. At approximately 6:30, Sivils called Cerda's apartment. Benavente answered. Cerda came to the phone and told Sivils that he would meet Sivils in the lobby at 7:00. Benavente arrived at 7:00 and escorted Sivils to a car in which Cerda was waiting. They drove to Cerda's apartment, but stayed in the car. Cerda and Sivils talked and, during the conversation, Cerda patted Sivils in the chest area. He felt the thin transmitter in Sivils' coat pocket and asked if Sivils was wearing a pacemaker; he asked Sivils if he had any "problems." Sivils told him that the lump in his breast pocket was money. Cerda invited Sivils to stay in Cerda's apartment overnight with Benavente. Sivils declined. Sivils asked Cerda for money. Throughout the entire conversation, Benavente was in the back seat of the car.

Cerda got out of the car at his apartment, and Benavente drove Sivils back to the hotel at about 7:30. An hour later, Sivils once more called Cerda and told him he was leaving town soon and asked if he could meet with Cerda. Cerda again asked Sivils to spend the night and Sivils refused. A few minutes later Sivils called Cerda again, and Cerda agreed to send Benavente to drive Sivils to the airport.

Shortly after this last call, both Cerda and Benavente, together with another man, left Cerda's apartment. Benavente got into one vehicle and Cerda and the other man got into a separate vehicle. Both cars drove to the hotel, Benavente's car leading. Benavente pulled up in front of the hotel, but Cerda's car parked well back from the entrance. Benavente got out of the car to meet Sivils. He opened the trunk and helped Sivils put his two bags into it. Sivils showed Benavente the portfolios and book that were inside the briefcase. Benavente nodded, but said nothing. Benavente and Sivils got into the car, and both cars were stopped by agents as they began to pull out. The defendants were arrested.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant Benavente argues that the evidence was insufficient as a matter of law to support the jury's finding that he conspired to import cocaine. He contends that there was no direct evidence linking him to the cocaine conspiracy and that he was convicted solely on the basis of his presence during some parts of the transaction. He therefore argues that the district court erred in denying his motion for judgment of acquittal made in accordance with Fed. R.Crim.P. 29.

In reviewing the sufficiency of the evidence, we must consider the evidence "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.1990). We must then determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Rivera–Santiago*, 872 F.2d 1073, 1078–79 (1st Cir.1989).

To prove conspiracy, the government must show the existence of a conspiracy and the defendant's knowing and voluntary participation in it. *United States v. Aponte–Suarez*, 905 F.2d 483, 489 (1st Cir. 1990). "More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" *United States v. Gomez–Pabon*, 911 F.2d

847, 852 (1st Cir.1990) (quoting *Rivera–Santiago*, 872 F.2d at 1079). The government need not provide direct evidence of intent. "The agreement, whether tacit or express, may be proven by circumstantial as well as express evidence." *Rivera–Santiago*, 872 F.2d at 1079 (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Nor must a defendant know of all the details of the plan or participate in all of its objectives. *Aponte–Suarez*, 905 F.2d at 490. However, mere association with conspirators or presence at the scene of the crime does not establish conspiracy. *Gomez–Pabon*, 911 F.2d at 853; *United States v. Hyson*, 721 F.2d 856, 862 (1st Cir.1983).

■ Applying these standards, we find that there was sufficient evidence to support defendant Benavente's conviction. Benavente was present at three significant junctures of the planned transaction between Cerda and Sivils. Benavente, together with Angie, came to the hotel to meet Sivils after Cerda had told Sivils that Cerda himself would come. Benavente and Angie talked with Sivils for three hours, and Sivils testified that during this time Benavente felt his legs; Sivils stated that he assumed from the way Angie and Benavente were acting, together with the touching, that they were trying to discover if he was fitted with a recording device. Benavente went with Sivils to Sivils' room to call Cerda at work and provided the phone number. Shortly thereafter, Benavente and Angie left the hotel and met with Cerda at work. Cerda again called Sivils and told him he would meet him in the lobby. Once again, it was Benavente who arrived and showed Sivils to the car where Cerda was waiting. Benavente waited in the rear seat of the car while Cerda "frisked" Sivils and asked if he was wearing a pacemaker and while Sivils asked Cerda for money. The next day, Benavente again returned to the hotel to take Sivils to the airport. When placing his briefcase in the trunk, Sivils showed Benavente the portfolios and the book that contained the concealed cocaine and Benavente nodded.

To be sure, other evidence discounted the possibility of Benavente's playing a role in the drug conspiracy. It was undisputed that Benavente and Sivils had known one another for seventeen years through business dealings in Nicaragua. In addition, the cocaine consistently was referred to as "computer parts" or "computer printouts" in all of the conversations between Cerda and Sivils. Sivils testified that Benavente had never to his knowledge been involved in prior transactions between Sivils and Cerda. No direct evidence indicated that Benavente had agreed to be involved in this conspiracy.

Nevertheless, we think that Benavente's repeated presence during critical stages of this transaction, together with the timing and circumstances of his presence, tend to indicate that Benavente was assisting Cerda to determine if Sivils was cooperating with the government. While his presence on any single occasion would not have been sufficient to find him guilty of conspiring, his repeated presence amounts to substantial circumstantial evidence that that presence was not innocent. *See United States v. Lema*, 909 F.2d 561, 570 (1st Cir.1990). This inference is significantly bolstered by Benavente's unexplained touching of Sivils' legs in the bar and his later observation of Cerda frisking Sivils. A jury reasonably could conclude that such touching was inconsistent with casual friendly meetings between Benavente and Sivils. Given these facts, we believe that the jury had sufficient evidence to find Benavente guilty beyond a reasonable doubt.

## III. MOTION FOR NEW TRIAL

■ At his sentencing hearing, Cerda asked the court for the opportunity to say a final word. He then stated:

My friend who was arrested with me in Miami, Mr. Benavente, who was a person who was in my apartment after three days when he returned from Nicaragua. I want to say that that man, Your Honor, is innocent. Nobody pointed a finger at him, even the D.E.A., the informer or the prosecutor in this case I am sure he knows in his mind that he is not guilty.

He just happened to be in my apartment seventy-two hours ago from Nicaragua running away from war, poverty and trying to make a living to help his family of seven in Nicaragua.

And another person who happened to be in my apartment from Nicaragua that was released by the judge, by the magistrate the next day. So I can't leave with that on my conscience because that man is not guilty.

Shortly thereafter, Cerda provided an affidavit stating in similar terms:

That Pedro Benavente a/k/a Pedro Pablo Benavente–Gomez was not a participant, conspirator or had any role at all in the commission of the acts charged in the indictment. Benavente had no knowledge, nor willful intent to become part of the conspiracy, nor was aware of what was going on.

On the basis of these statements, Benavente moved the district court for a new trial. He argued that Cerda's exculpatory statements were newly discovered evidence under the rule. The district court denied the motion.

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *United States v. Angiulo*, 847 F.2d 956, 983 (1st Cir.1988). The remedy is used sparingly, and this court will reverse the district court's decision only upon a showing that the court abused its discretion. *Id.* at 984. Any factfinding by the district court will be affirmed unless clearly erroneous. *Id.*

In order to be entitled to a new trial based on newly discovered evidence, the defendant must show: 1) the evidence was not known or available to the defendant at the time of trial; 2) the failure to discover the evidence was not due to lack of diligence on the part of the defendant; 3) the new evidence is material and not merely cumulative or impeaching; and 4) the evidence would probably produce acquittal upon retrial of the defendant. *See United States v. Martin*, 815 F.2d 818, 824 (1st Cir.1987); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980).

In this case, the district court found that there was nothing that prevented Benavente from presenting Cerda's testimony at trial. The court also concluded that Cerda's statements amounted at most to impeachment evidence that did not warrant a new trial. Finally, the court found that Cerda was not sufficiently credible to have any effect on the jury's verdict.

We find no abuse of discretion in the district court's decision not to grant a new trial. In the first place, well before trial, the government supplied Benavente with a statement taken from Cerda in which Cerda denied any involvement by Benavente in the affair. Thus, Benavente knew before trial that Cerda had exculpated him. Nevertheless, although Cerda testified at trial, Benavente never cross-examined Cerda on the issue of Benavente's involvement. The court clearly did not abuse its discretion in determining that the exculpatory evidence was not newly discovered.

Benavente argues, however, that the statements made at sentencing and in the post-trial affidavit are of a different character than those which could have been elicited at trial. Because both Cerda and Benavente took the stand at trial and denied any illegal doings, Benavente argues that Cerda's statements after trial must be seen as enhanced exculpatory testimony because they occurred in the context of an admission of his own guilt. He therefore argues that, even had Cerda exculpated Benavente at trial, a new trial nevertheless would be required.

Factually, we can find no evidence to support this claim. Neither of Cerda's statements admit Cerda's own guilt. They merely state that Benavente had nothing to do with the charged offenses. While one may argue that Cerda's claim to a troubled conscience *implies* such an admission, Cerda continues to argue on appeal that his conviction was improperly obtained, maintaining the story he gave at trial. In addition, the district court found at the sentencing hearing that Cerda did not accept responsibility for the crime. Nowhere in the record before this court does it appear that

Cerda presently admits his own involvement.

Even if Cerda had admitted his guilt in post-trial statements, the district court would have retained discretion to deny a new trial. It is true that where the trial evidence was noticeably thin, new exculpatory evidence may be of increased importance. *See Ledet v. United States*, 297 F.2d 737, 739 (5th Cir.1962) (reversing the denial of a new trial where evidence of appellant's involvement was particularly tenuous and where inculpating hearsay of co-defendant, denied after trial, was improperly admitted against defendant). *But see United States v. Metz*, 652 F.2d 478, 480 (5th Cir.1981) (limiting *Ledet* to its facts and holding that newly available evidence is not the same as newly discovered evidence); *United States v. Di Bernardo*, 880 F.2d 1216, 1225 (11th Cir.1989) (same). But attempts by one defendant to take full responsibility after trial and conviction are common and are viewed with skepticism. *See, e.g., United States v. Rodriguez*, 738 F.2d 13, 18 (1st Cir.1984); *Vega Pelegrina v. United States*, 601 F.2d 18, 21 (1st Cir. 1979). Indeed, in *Vega Pelegrina*, 601 F.2d at 21, this court addressed the precise claim Benavente makes. There, the court upheld the denial of a new trial where a co-defendant earlier had denied both his own involvement and that of the appellant. After trial, the co-defendant admitted his own guilt, while continuing to exculpate the appellant. This court held that the district court did not err in finding that the arguably enhanced exculpatory evidence of the co-defendant, like impeachment evidence, did not rise to the level of materiality that would be likely to cause a different result at a new trial. The district court therefore clearly was not required to order a new trial based on Cerda's "enhanced" testimony.

Finally, the district court found that Cerda was not a sufficiently credible witness in Benavente's behalf to have been likely to produce a different outcome on retrial. We cannot say that the district court's finding was clearly erroneous, *see Angiulo*, 847 F.2d at 984; *Rodriguez*, 738 F.2d at 18, particularly in light of our doubts about whether Cerda presently admits his own guilt. We therefore conclude that the district court was within its discretion in denying the motion for new trial, and we affirm its decision.

## IV. ADMISSION OF TOLL RECORDS

Defendant Cerda makes a single argument on appeal. He claims that the district court abused its discretion when it admitted into evidence a toll record of telephone calls made from Cerda's residence. The telephone record revealed that Cerda had made calls to Venezuela, where the cocaine was purchased, including a call in the early morning hours of June 20 to the hotel in Caracas where Sivils was staying. This call specifically corroborated Sivils' testimony that Cerda had called him at that time to authorize him to purchase the drugs from a courier Sivils had never met.

The government presented no testimony from a custodian of the records or other qualified person authenticating the document, so the toll record could not properly be admitted under the hearsay exception for business records. *See* Fed.R.Evid. 803(6). The district court ultimately admitted the document under the residual hearsay exception, Fed.R.Evid. 803(24).[2] Cerda contends that the evidence did not meet the

---

2. Under Fed.R.Evid. 803(24), the following evidence is not excluded by the hearsay rule:

   A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the gener-

al purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

requirements for admission under this exception.

█ The district court's decision to admit evidence under Rule 803(24) is subject to review for abuse of discretion. *See Brookover v. Mary Hitchcock Memorial Hospital*, 893 F.2d 411, 419 (1st Cir.1990). We will not disturb the court's decision to admit a statement under the exception unless we have a " 'definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.' " *United States v. Doe*, 860 F.2d 488, 491 (1st Cir.1988) (quoting *Page v. Barko Hydraulics*, 673 F.2d 134, 140 (5th Cir.1982)).

█ Although Cerda claims that none of the requirements of Fed.R.Evid. 803(24) are met, he argues most strenuously that the government failed to satisfy the pretrial notice requirement. We agree. The defendant received no pretrial notice of the existence of the toll record or the government's intention to offer it into evidence. Although this court has adopted a flexible approach to pretrial notice, we have expressly noted that the approach, at least in criminal cases, "is warranted only when pretrial notice is wholly impractical." *United States v. Doe*, 860 F.2d 488, 492 n. 3 (1st Cir.1988). Moreover, "[e]ven under a flexible approach, evidence should be admitted only when the proponent is not responsible for the delay and the adverse party has an adequate opportunity to examine and respond to the evidence." *Id.* *Cf. Furtado v. Bishop*, 604 F.2d 80, 92 (1st Cir.1979) (in civil cases, absence of pretrial notice not fatal where opposing party aware of document and prepared to meet it at trial, despite the absence of any justification for delay).

In this case, Cerda was not informed of the existence of the toll record until trial. The government presented no reasons either to the district court or to this court for believing that notice was "wholly impractical." The government had the toll record in its possession well in advance of trial, and does not claim that a records custodian ever was sought, much less suddenly unavailable to testify. Indeed, the govern-

ment has not even argued in its appellate brief that admission under Rule 803(24) was proper or that notice should be excused. It makes no effort to explain its failure properly to authenticate the documents, making only a passing reference to the fact that it had not intended to offer, and did not offer, the document in its case in chief. Thus, the circumstances here are unlike those in which we have endorsed admission of unauthenticated documents. *See United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir.1989) (failure of government properly to authenticate documents under business record exception did not prevent admission under Fed.R.Evid. 803(24) where, along with meeting other requirements, government had given advance notice of intent to use document); *Doe*, 860 F.2d at 492 (government was not aware of existence of telexes until trial, and government's failure to be aware was "innocent and inadvertent").

The district court made no finding that notice was impractical or that the government was not responsible for the delay, a finding that *Doe* requires, even under the flexible test. Moreover, although the district court did find that Cerda was not prejudiced because he "admitted" to the phone calls, Tr. III (Excerpt): 20, we find no such admission. While Cerda admitted that the document he was shown reflected his telephone number, he denied having made the calls to Venezuela. He had no opportunity to assure that the document was what it purported to be. On this record, we cannot say that failure to receive pretrial notice was not prejudicial.

The residual exception to the hearsay rule is one intended to be used "very rarely, and only in exceptional circumstances," S.Rep. No. 1277, 93rd Cong.2d Sess. 20 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7066. It was not intended "to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions" or "to authorize major judicial revisions of the hearsay rule, including its present exceptions." *Id.* *See also Brookover*, 893 F.2d at 419–20. It seems to us

clear that, in a criminal case, where no explanation for failing to meet the notice requirement has been made and where, if properly authenticated, the document would have been admissible under a specific exception, a party may not avoid the requirements of the specific rule via the residual exception simply by reading the notice requirement out of existence. The admission of the toll records under Fed.R. Evid. 803(24) therefore was erroneous.

■ This error, however, does not require reversal of Cerda's conviction for two reasons. First, we find that Cerda's argument has not been properly preserved for appeal. An objection to the admission of evidence must be timely made by the party opposing the admission, or it is waived. *See, e.g., Willco Kuwait (Trading) S.A.K. v. De Savary,* 843 F.2d 618, 625 (1st Cir. 1988); Fed.R.Evid. 103(a)(1)). As the government points out, Cerda did not object to the toll record at the time it was admitted. Although he had earlier objected to the toll record when it was used to refresh the recollection of a government witness and to impeach himself,[3] he made no objection or motion to strike when, at

the close of Cerda's testimony the court, *sua sponte,* admitted the document into evidence. Instead, after the admission, three pages of transcript were recorded before Cerda even attempted an objection, and no specific grounds for the objection were urged until another two pages passed. During those first intervening pages, both the defendants and the government rested their cases and the jury was released for the day. The court then addressed the attorneys on whether there was a need for a wholly unconnected ruling. While the court was inquiring on that issue, the defendant attempted to object to the admission of the toll record. The court ultimately heard the objection and explained its earlier ruling, but we find that this objection came too late to preserve the objection for appeal. *See Rivera–Santiago,* 872 F.2d at 1085 (motion to strike at end of evidence is not timely). No explanation for the tardy objection was offered by the defendant in his brief, *see Shepp v. Uehlinger,* 775 F.2d 452, 454 (1st Cir.1985) (no justification for failure to make objection timely), and no motion to strike ever was made.[4] The objection therefore was

3. To be sure, this original objection, itself somewhat tardy, argued that the document was hearsay and that no notice was given to the defendant. Tr. Vol. VI: 81, 83. We note, however, that the court at that time ruled only that it would allow the document to be used to refresh the DEA agent's recollection. Cerda did not object on the ground that the agent had no independent knowledge to refresh. Thus, Cerda did not properly preserve an objection to the document's use to refresh recollection on the basis of lack of personal knowledge. *See* Fed.R. Evid. 103(a)(1) (requiring objection to state specific grounds); *United States v. Castiello,* 915 F.2d 1, 2–3 (1st Cir.1990) (objection on one ground at trial does not preserve different objection on appeal); *United States v. Dunn,* 758 F.2d 30, 38 n. 3 (1st Cir.1985) (objection to admission of tape recordings did not preserve objection to testimony about occurrence of incident). Moreover, the court did not rule at that time on the admissibility of the record. Cerda therefore was required to renew his objection later to preserve the hearsay point. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 103[02], at 103–23 (1986) (if court reserves ruling, it is counsel's obligation to raise point again). *Cf. Doty v. Sewall,* 908 F.2d 1053, 1056 (1st Cir. 1990) (where court has declined to rule in limine, objection is not preserved unless raised again when evidence is offered at trial).

Cerda's objections to the document's use during his own cross examination were not specific. He first suggested only that the counsel's reference to the document was misleading because it had not been admitted into evidence. The court again allowed the record to be used to refresh Cerda's recollection. Tr. Vol. IX: 28–29. Cerda also registered a non-specific objection later in cross-examination. Tr. Vol. IX: 29.

4. At oral argument, Cerda's attorney attempted some explanation for the late objection. He argued that the court had referred to the document as admissible when it was being used to refresh the DEA agent's recollection. He therefore argues that an objection to the admission of the records would have been futile. In the first place, defendant's argument, not having been raised in the brief, is not preserved by raising it at oral argument. *See Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir. 1983). Moreover, as we have noted *supra* n. 3, the record clearly shows that the court's ruling, given on a specific request for clarification by defendant's attorney, was that the record could be used to refresh recollection. The court made no ruling on admissibility. We therefore find no evidence that a later objection would have been futile.

waived.[5]

Second, even had the objection been properly preserved, this court would find any error in admitting the document to have been harmless. *See* Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."). An error "is harmless if we determine that it is 'highly probable' that the error did not contribute to the verdict." *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 580 (1st Cir.1987) (quoting *United States v. Bosch*, 584 F.2d 1113, 1117–18 (1st Cir.1978)).

The document was admitted into evidence only after all evidence in the case had been heard. As we have noted, prior to its admission, the toll record was used both to refresh the recollection of a government witness and to impeach defendant Cerda, and the incriminating telephone calls were revealed to the jury at those times. In his opening appellate brief, Cerda does not challenge the earlier uses of the document. Although he contends in his reply brief that those uses also were inappropriate, these arguments, not raised in his opening brief, are waived.[6] *See Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 86 (1st Cir.1990); *Pignons S.A. de Mecanique*, 701 F.2d at 3 (appellant cannot preserve a claim merely by referring to it in a reply brief or at oral argument). We therefore do not address whether the earlier uses were appropriate.

Because the prejudicial portions of the toll records had been made known to the jury long before the document was admit-

ted, admission of the records themselves must be considered harmless.

## V. CONCLUSION

Having reviewed each of appellants' claims, we affirm the convictions.

---

**5.** Inasmuch as we conclude *infra* that the admission of the toll records was harmless, it is clear, *a fortiori*, that review under the plain error standard of Fed.R.Crim.P. 52(b) would not aid the defendant.

**6.** This is not a mere technical requirement of form over substance. It is true that in this case the order of briefing did not leave this court with "but one side of a two-sided story" on the appropriateness of using the toll record to refresh recollection and impeach, *see Sandstrom*, 904 F.2d at 87; both parties addressed the issues, albeit in reverse order. But, because appellee had no right to reply to a reply brief, this court *was* deprived of helpful briefing on the

adequacy of objection below to those uses, an issue we consider significant. *See supra* n. 3. Moreover, it is possible that the defendant made a tactical decision not to appeal the use to refresh recollection because of an imperfect objection. For both of these reasons, application of the formal requirement here is consistent with the primary purpose of the requirement— that of fairness to the opposing party. In addition, scarce judicial resources are preserved. *Cf. Sandstrom*, 904 F.2d at 87 (waste of resources for counsel to do homework only at appellate stage); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (court should not be expected to do counsel's work).