UNITED STATES, Appellee,

v.

Ismael RODRIGUEZ–ALVARADO, Defendant, Appellant.

No. 91–1102.

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1991.

Decided Dec. 27, 1991.

Jose Antonio Pagan Nieves, Old San Juan, P.R., by Appointment of the Court, for defendant, appellant.

Carlos A. Perez, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN and TIMBERS,* Senior Circuit Judges.

TIMBERS, Circuit Judge:

Ismael Rodriguez Alvarado appeals from a judgment entered on a jury verdict convicting him of bank fraud pursuant to 18 U.S.C. § 1344 (1988) and of aiding and abetting the misappropriation of bank funds pursuant to 18 U.S.C. § 656 (1988). He was sentenced to 7 years in prison.

His chief contention on appeal is that the government failed to prove the necessary element of intent. He also contends that the district court erred in reading the indictment to the jury only after the first witness had begun her testimony. He further contends that the district court erred in refusing to admit a letter from Banco de Ponce's insurance company which criticized the bank's issuance of a stop payment order on the manager's checks drawn to the order of Rodriguez. Finally, he contends that the district court erred in instructing the jury regarding check kiting and in refusing to charge the jury in accordance with his requests.

We affirm.

## I.

We shall set forth only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

In 1983, Rodriguez began a lottery ticket brokerage business in Puerto Rico. The sale of lottery tickets is conducted by the government of Puerto Rico through its agency, the Loteria de Puerto Rico (Loteria). Under this system, lottery ticket agents purchase tickets in numbered lots in advance of the drawing. These advance purchases from the government agency often are required before individual agents have completed sales for upcoming drawings; as a result, it is commonplace for individual agents to have difficulty making their full purchases because of cash flow problems. Lottery ticket agents therefore rent their agencies to brokers. The lottery ticket brokers assist individual agents in purchasing their ticket allotments by making payments directly to the Loteria de Puerto Rico and by selling the tickets. The brokers give the owners of the agencies the earnings they would have made through the year and they retain a certain percentage as a commission. Both the Commonwealth of Puerto Rico and the Loteria have endorsed the business of the lottery ticket broker as a legitimate business which assists agents and results in higher profits to the government.

Rodriguez was the lottery ticket broker for some 200 agencies in Puerto Rico. In view of the large cash outlay involved, on at least one occasion Rodriguez took out a commercial loan to make the payment to the Loteria. When he became a broker, Rodriguez maintained a bank account at Banco Comercial de Mayaguez, a bank insured by the Federal Deposit Insurance Corporation. The account was in the name of his former magazine distributorship, Rodal Magazine Distributors. After the brokerage business began to thrive, Rodriguez obtained from his bank $10,000 in certificates of deposit (CD's). He gave them as collateral for a short term commercial loan. The proceeds from the loan were deposited in the Rodal account.

Most of the other lottery brokers and sellers regularly conducted their business through the Banco de Ponce which was insured by the Federal Savings Loan Insurance Corporation. Rodriguez opened a second account in the Chardon Street branch of Banco de Ponce. Since the Loteria would not accept personal checks as payment, Rodriguez drew a personal check on the Rodal account. This subsequently was authorized by Carmen Marrero, a Banco de

* Of the Second Circuit, sitting by designation.

Ponce manager, to be used to purchase a manager's check. Upon receiving a manager's check in exchange for his personal check, Rodriguez could purchase the lottery ticket allotments from the Loteria. At Marrero's suggestion Rodriguez discontinued drawing checks on the Rodal account. He began presenting checks drawn on his sister's account. She signed the checks in blank and let Rodriguez fill in the necessary dates and amounts. During all of these transactions, as Rodriguez points out, none of the checks was returned for insufficient funds. Rodriguez used his earnings from the brokerage business to purchase additional CD's in the amount of $400,000 from Banco de Mayaguez. These CD's were used as collateral for further short term loans and to guarantee personal checks for future lottery transactions.

In early April 1985, Marrero, the Banco de Ponce manager, stated that she was "becoming ill in [her] nerves and heart", because she realized that she was authorizing payment of checks in excess of her bank's established limits. Under bank policy, when a client presented a check drawn against another bank, the client was required to deposit it in his account. The manager, without obtaining approval from her immediate supervisor, could authorize payment of checks for amounts up to $15,-000 without collateral and up to $25,000 with collateral. These limits applied on a daily basis to each individual client. If a client wanted authorization for payment of a check drawn on another bank and if he owned CD's to guarantee the transaction, the bank manager again was authorized to certify payment of checks up to the established amounts. The CD's then would be retained in the Banco de Ponce vault, to be removed only in the presence of two bank officers. On April 11, 1985, at Marrero's request, Rodriguez signed an affidavit stating that he had adequate property to cover the amounts of checks subsequently to be authorized by Marrero to be paid.

On April 24, 1985, Zenaida Vazquez, an employee of Banco de Ponce, was introduced to Rodriguez by Marrero. At that meeting, Marrero instructed Vazquez to authorize checks for Rodriguez drawn against other banks because he was a "good customer". Thereafter, however, Vazquez refused to give the necessary authorizations, claiming that such authorizations were contrary to explicit bank policy.

After her refusal to authorize payment of the checks presented by Rodriguez, Vazquez telephoned her supervisor to inform him that some transactions were being authorized by Marrero even though they exceeded the bank's policy limits. Marrero was questioned by bank officers. She claimed that she was authorizing payment of checks over the bank's policy limits since Rodriguez had certified by affidavit that he had more than $400,000 in CD's which he maintained as collateral. Further inquiry disclosed that the CD's were not being held in the vault at the Chardon Street branch; but that they had been used as collateral for another outstanding commercial loan.

Bank officers responded by placing stop payment orders on the manager's checks. Banco de Ponce claimed losses exceeding $1 million. Apparently, this loss resulted when Rodriguez's personal checks, having been substituted by manager's checks, were returned for insufficient funds. A bank investigation disclosed that during the month of April 1985, 336 checks from the accounts of Ponce Federal Bank and Banco Comercial de Mayaguez were presented; during that period, 299 manager's checks and 962 money orders were issued to Rodriguez. A total of $12.5 million in checks were presented that month.

Rodriguez subsequently signed a repayment agreement, secured by a mortgage note, pursuant to which he agreed to repay approximately $1,186,000, together with 12% interest. He reduced the amount owed to $638,987.25, but was unable to make any further payments.

Rodriguez was indicted on March 14, 1990 for bank fraud in violation of 18 U.S.C. § 1344, and for aiding and abetting the misappropriation of bank funds in violation of 18 U.S.C. § 656. He was convicted on all counts and was sentenced as stated

above. He claims errors as set forth above in the second paragraph of this opinion.

## II.

### (A)

Rodriguez's chief claim of error is that the evidence was insufficient to prove the element of intent, a requisite of conviction under § 1344 and § 656.

■ "In reviewing the sufficiency of the evidence, we must consider the evidence 'in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict.'" *United States v. Valencia–Lucena,* 925 F.2d 506, 512 (1st Cir.1990) (quoting *United States v. Benavente Gomez,* 921 F.2d 378, 380 (1st Cir. 1990), which in turn quoted (*United States v. Angiulo,* 897 F.2d 1169, 1197 (1st Cir. 1990), *cert. denied,* 111 S.Ct. 130 (1990))). The evidence need not exclude every reasonable hypothesis of innocence. *United States v. Rivera Rodriguez,* 808 F.2d 886, 890 (1st Cir.1986). In reviewing the sufficiency of the evidence in support of the verdict, we do not assess the credibility of the witnesses. *Valencia–Lucena, supra,* 925 F.2d at 512.

■ The mere existence of a check kiting scheme does not as a matter of law imply the intent required for a bank fraud conviction pursuant to § 1344; specific intent must be proven. *United States v. Rhodes,* 886 F.2d 375, 381 (D.C.Cir.1989); *see also United States v. Faulhaber,* 929 F.2d 16 (1st Cir.1991); *United States v. Bales,* 813 F.2d 1289 (4th Cir.1987). We recognize that "[w]illfulness can rarely be proven by direct evidence, since it is a state of mind, it is usually established by drawing reasonable inferences from the available facts." *United States v. Bank of New England, N.A.,* 821 F.2d 844 (1st Cir. 1987), *cert. denied,* 484 U.S. 943 (1987).

### (B)

We turn first to the evidence that Rodriguez had the knowledge and intent neces-

sary to defraud the bank in violation of § 1344.

■ Rodriguez pledged as collateral approximately $400,000 in CD's which had been pledged as collateral for a preexisting commercial loan. He presented to Banco de Ponce checks drawn in blank from another account in the name of his sister. Marrero told Rodriguez in April 1985, that she had reservations about her authority to accept his checks in exchange for manager's checks. He responded with an affidavit which asserted that property was available as collateral for checks she authorized to be paid; actually, part of that property was not available for that purpose. There was ample evidence that Rodriguez was a savvy businessman. He operated his own magazine distributorship, Rodal Magazines. In his capacity as lottery broker, he oversaw the operations of more than 200 lottery ticket agencies which involved the use of at least a million dollars for the purchase of lottery tickets.

From all of this evidence, we hold that it would be reasonable for a juror to conclude that Rodriguez had the requisite knowledge and intent for a scheme or artifice to defraud or to obtain money by false pretenses, as prohibited by § 1344.

### (C)

We turn next to the evidence that Rodriguez had the knowledge and intent necessary to aid and abet the misapplication of bank funds in violation of § 656.

Cases in which customers of a bank are charged with aiding and abetting a bank officer in misapplying bank funds are troublesome because the customer himself usually is not a principal in the offense. The customer may be an accessory, but only if the bank officer as a principal has committed the substantive offense. *United States v. Giordano,* 489 F.2d 327, 330 (2d Cir.1973) (citations omitted); *see also United States v. Cyr,* 712 F.2d 729, 732 (1st Cir.1983). Loaning amounts in excess of bank policy lending limits, where the objective of that policy is to prevent economic loss to the bank, has been construed as "misapplication" of bank funds within

the meaning of § 656. *United States v. Clark*, 765 F.2d 297, 303 (2d Cir.1985). A reckless disregard by a bank officer of his bank's interest also is sufficient to establish the requisite intent to defraud. *Cyr, supra*, 712 F.2d at 732.

In the acts of aiding and abetting in the instant case, the additional element of Rodriguez's specific intent to injure or defraud the bank is required. *United States v. Moss*, 628 F.Supp. 525 (S.D.N.Y.1986) *aff'd*, 795 F.2d 1005 (2d Cir.1986); *Clark, supra*, 765 F.2d at 297; *United States v. Beran*, 546 F.2d 1316, 1322 (8th Cir.1976), *cert. denied*, 430 U.S. 916 (1976). "Even if the bank officer was guilty as a principal, there must also be proof that the defendant depositor had knowledge of the criminal activity of the bank officer, and more, encouraged or participated in it with a desire to forward it." *Giordano, supra*, 489 F.2d at 330 (citations omitted). A jury may look to circumstantial evidence as proof of the requisite intent. *Bales, supra*, 813 F.2d at 1294.

█ Here the government presented sufficient evidence to establish a finding of intent on the part of Rodriguez to encourage or participate in Marrero's misapplication of bank funds in violation of § 656. For instance, Marrero testified at trial that from November 1984 until mid-April 1985, Rodriguez gave her various gifts which included a "paella", a Spanish dish, in celebration of Thanksgiving; funds for a holiday party in the branch; an invitation to Rodriguez's private home which was accepted by Marrero and one other branch employee; winning lottery tickets worth approximately $300 each; and $3,000 to help Marrero provide for herself and her sick daughter. When Marrero questioned her own authority to pay those checks which Rodriguez presented to her, he gave her the flawed affidavit listing his property as available collateral. Rodriguez offered as collateral for Marrero's authorization the previously pledged CD's. Manager's checks, which Rodriguez sought in order to present acceptable payment to the Loteria, were drawn to his order, rather than to the order of the Loteria. Indeed some of the manager's checks were drawn to the order of Rodriguez's sister and brother-in-law. They later endorsed the checks to the order of Rodriguez himself.

In his defense, Rodriguez asserted ignorance of banking procedures, claiming full reliance on Marrero's knowledge, despite the fact that he had maintained numerous bank accounts in various financial institutions; that he had purchased several CD's in large amounts; that he had obtained at least one substantial commercial loan; and that he had been responsible at various times for the management of both Rodal Magazine Distributors and the 200 lottery agents for which he acted as broker.

We hold that there was sufficient evidence of Rodriguez's knowledge and intent to aid and abet Marrero's misapplication of bank funds in violation of § 656.

### III.

Rodriguez claims that the district court erred in reading the indictment to the jury only after the government's first witness, Zenaida Vazquez, had begun to testify. At trial, Rodriguez did not object to the delayed reading of the indictment. Furthermore, it was the court who noticed the failure to read the indictment at the trial's outset; as a result, the district court administered a curative instruction to the jury.

The purpose of reading the indictment is to inform the jury fairly of the charges against the defendant. *Martin v. United States*, 335 F.2d 945, 950 (9th Cir.1964). There is no requirement that such information be given by reading the whole, or even part, of the indictment; indeed, the reading of mere summaries of the indictment have been upheld. *Id.* Furthermore, the indictment need not be read immediately after empaneling the jury. *United States v. Long*, 706 F.2d 1044, 1056 (9th Cir.1983) (upholding reading of indictment during jury charge). In *United States v. Gomez-Pabon*, 911 F.2d 847 (1st Cir.1990), *cert. denied*, 111 S.Ct. 801 (1991), the defendant challenged the reading of the indictment during the third day of trial after the jury had heard the testimony of the govern-

ment's chief witness. We held that such reading of the indictment, absent objection and followed by a curative charge, was not plain error; in the context of the entire trial, the error was not such as to undermine "the fundamental fairness of the trial and contribute to a miscarriage of justice." *Id.* at 859.

■ Here the district court, after reading the indictment, instructed the jury that the indictment was merely a statement of the offenses charged and as such had no evidentiary value. We hold that this did not constitute prejudicial error.

### IV.

■ Rodriguez also claims that the district court erred in refusing to admit a letter from Banco de Ponce's insurance company which placed blame on the bank for the amount of loss it sustained as a result of its stop payment order. This letter was held to be inadmissible under Federal Rule of Evidence 403, since it raised issues collateral to Rodriguez's prosecution and as such would unduly confuse the jury. Admission of such evidence is usually within the discretion of the district court, *United States v. Aponte–Suarez*, 905 F.2d 483 (1st Cir.), *cert. denied*, 111 S.Ct. 531 (1990), and such rulings are reversible only for an abuse of discretion. *Id.*

We hold that there is nothing in the record to suggest such an abuse of discretion.

### V.

■ Finally, Rodriguez contends that the jury charge contained an improper characterization of the term "check kiting", which was compounded by the court's refusal to give his requested charge. A district court is not required to use the precise language requested by a party as long as all necessary elements of the offense are adequately stated. *United States v. Boylan*, 898 F.2d 230 (1st Cir.1990), *cert. denied*, 111 S.Ct. 139 (1990).

We hold that the district court's charge in this case was sufficient.

### VI.

To summarize:

There was adequate circumstantial evidence of Rodriguez's specific intent to defraud the bank and to aid and abet the misapplication of funds to support his convictions pursuant to § 1344 and § 656. His challenge to the reading of the indictment is without merit since he was not denied a fair trial. The rulings on the inadmissibility of evidence proffered by Rodriguez and the appropriate language of the jury charge were well within the discretion of the district court.

*Affirmed.*