USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1229 UNITED STATES, Appellee, v. STELIOS M. VAVLITIS, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella, Circuit Judge, _____________ and Bownes, Senior Circuit Judge. ____________________ ____________________ Robert A. George on brief for appellant. ________________ Jonathan L. Kotlier, Assistant United States Attorney, and A. ____________________ __ John Pappalardo, United States Attorney on brief for appellee. _______________ ____________________ November 19, 1993 ____________________ BOWNES, Senior Circuit Judge. Defendant-appellant, BOWNES, Senior Circuit Judge. ____________________ Stelios M. Vavlitis, was convicted of bank fraud, 18 U.S.C. 1344(1), for kiting checks and withdrawing money from accounts bearing insufficient funds. We consider on appeal whether the district court erred by dismissing midtrial the superseding indictment on which Vavlitis had not been arraigned, and by allowing the trial to continue on the original indictment. We also must determine whether the jury instruction on reasonable doubt was erroneous, and whether there was sufficient proof of fraudulent intent. We affirm. I. I. __ BACKGROUND BACKGROUND __________ In January 1990, Vavlitis maintained seven checking accounts, including six commercial accounts and one personal account, at two federally-insured banks, Atlantic Bank and Trust Company (Atlantic Bank) and Bank of New England. Four of the accounts were with Atlantic Bank; Bank of New England held the remainder. Vavlitis was an authorized signatory on each of these accounts. Atlantic Bank's practice at all relevant times was to credit Vavlitis's accounts with funds equal to the face value of the checks he deposited, without a delay to verify that these checks would be honored by the banks on which they were drawn. This practice created a "float," a period of one or more days that would pass before -2- 2 a deposited check credited to an account would be processed and presented for payment from the account of the check writer--Vavlitis. From January 1990 until May 1990 when the banks froze his accounts, Vavlitis used the float to buoy up the balances in his accounts by exchanging checks drawn on insufficient funds between Atlantic Bank and Bank of New England. He withdrew money and wrote checks to third parties against funds he did not actually have, despite his inflated balances. The result was that when his four Atlantic Bank accounts were frozen on May 14, 1990, there was a total overdraft of $1,615,968.92. When Bank of New England, suspecting check kiting, closed Vavlitis's three accounts in May 1990, there was a combined positive balance of $683,292.63. On February 19, 1991, a grand jury returned an indictment charging Vavlitis with one count of bank fraud. The indictment alleged that between January and May 1990, Vavlitis orchestrated a check kiting scheme by depositing checks written on insufficient funds into the accounts he controlled at Atlantic Bank and Bank of New England. The charging paragraph of the indictment, paragraph seven, alleged that this scheme allowed Vavlitis to obtain "$1,615,968.00, more or less, owned by and under the custody and control of Atlantic Bank and Bank of New England." -3- 3 Paragraph nine alleged that as a result of the check kiting scheme, "Atlantic Bank suffered a loss of $1,615,968.00 more or less, minus $638,315.00 in funds recouped from the Bank of ____________________________________________________ New England checking accounts maintained by defendant STELIOS _____________________________________________________________ M. VAVLITIS, for a net ultimate loss of $932,653.00, more or _____________________________________________________________ less." (Emphasis added.) Vavlitis was arraigned on this ____ indictment on March 5, 1991. On March 12, 1991, the grand jury returned a superseding indictment, identical in all respects to the original indictment, except for paragraph nine. Paragraph nine of the superseding indictment stated that as a result of the check kiting scheme, "Atlantic Bank suffered a loss of $1,615,968.00 more or less." The superseding indictment thus alleged the total loss resulting from the scheme, but did not describe the "net ultimate loss." Because of an oversight by the prosecutor, Vavlitis was never arraigned on the superseding indictment. In her opening statement in Vavlitis's trial on November 30, 1992, the prosecutor referred to the indictment and stated that Vavlitis "left the banks with the $1.6 million loss." She did not use the term "superseding indictment." Defense counsel moved for a mistrial claiming that he had no notice of the superseding indictment,1 and  ____________________ 1. On September 6, 1991, more than one year before trial, the government served defense counsel with its trial memorandum, which stated: "Vavlitis is charged in the -4- 4 that his client had not been arraigned on it. The trial court denied the motion, pending further inquiry, and allowed the prosecution to call four witnesses from the two banks. After the first day of trial, the court found that Vavlitis had not been arraigned on the superseding indictment. The court granted the prosecution's motion to dismiss the superseding indictment and allowed the trial to continue on the original indictment. Defense counsel's renewed motion for mistrial and motion for dismissal were denied. The trial court subsequently denied a motion for judgment of acquittal, and the jury found Vavlitis guilty of bank fraud. II. II. ___ A. Dismissal of Indictment, Double Jeopardy, Variance, and A. Dismissal of Indictment, Double Jeopardy, Variance, and ________________________________________________________ Constructive Amendment Constructive Amendment ______________________ Vavlitis argues that the midtrial dismissal of the superseding indictment prevented any further prosecution on the original indictment, and that the continuation of the trial on the original indictment violated the Double Jeopardy Clause. We disagree. It is clear that the grand jury's return of a superseding indictment does not void the original indictment. See United States v. Friedman, 649 F.2d 199, 202 (3d Cir. ___ ______________ ________ 1981); United States v. Holm, 550 F.2d 568, 569 (9th Cir.), _____________ ____  ____________________ Superseding Indictment with one count of bank fraud . . . ." ______________________ (Emphasis added.) -5- 5 cert. denied, 434 U.S. 856 (1977). A defendant may use the _____ ______ Double Jeopardy Clause to prevent reprosecution following an acquittal or conviction on a superseding indictment, but may not rely on the notion that a superseding indictment instantaneously nullifies the original indictment. See ___ United States v. Bowen, 946 F.2d 734, 736 (10th Cir. 1991) _____________ _____ (finding "no authority which supports . . . that a superseding indictment zaps an earlier indictment to the end that the earlier indictment somehow vanishes into thin air"). Both indictments in this case remained valid until the district court granted the government's motion to dismiss the superseding indictment. Vavlitis also contends that the midtrial dismissal of the superseding indictment prevented further prosecution for the same offense charged in the original indictment. The aspect of the Double Jeopardy Clause at issue in Vavlitis's assertion is the protection against reprosecution following a favorable termination of proceedings midtrial. The "historical" underpinning of the double jeopardy prohibition is that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." -6- 6 United States v. Scott, 437 U.S. 82, 87 (1978) (quoting Green _____________ _____ _____ v. United States, 355 U.S. 184, 187-88 (1957)). One purpose _____________ of the prohibition on reprosecution following a midtrial ruling that ends the case is to protect the "valued right of a defendant to have his [or her] trial completed" by a particular tribunal. Id. at 92; United States v. Govro, 833 ___ _____________ _____ F.2d 135, 137 (9th Cir. 1987); United States ex rel. Young v. ___________________________ Lane, 768 F.2d 834, 838 (7th Cir.), cert. denied, 474 U.S. ____ _____ ______ 951 (1985). Given these principles, we find no merit in Vavlitis's double jeopardy argument. First, Vavlitis fails to show a second attachment of jeopardy. Jeopardy attached when the jury was impanelled for the bank fraud prosecution. See Crist v. Bretz, 437 U.S. 28, 37-38 (1978). There was no ___ _____ _____ impanelment of a second jury and no second verdict, thus no relinquishment of the valued right to a particular tribunal, no enhancement of the risk of an erroneous verdict, and none of the expense or the ordeal of a subsequent prosecution. Even if we assume that the further prosecution of Vavlitis on the original indictment following the dismissal of the superseding indictment constituted a reattachment of jeopardy, we would not find a double jeopardy violation. The district court dismissed the superseding indictment without resolving any factual issue in favor of the accused. Although the trial could have proceeded on the superseding -7- 7 indictment, see United States v. Boruff, 909 F.2d 111, 118 ___ _____________ ______ (5th Cir. 1990), cert. denied, 111 S. Ct. 1620 (1991); see _____ ______ ___ also Garland v. Washington, 232 U.S. 642, 644-46 (1914) ____ _______ __________ (affirming conviction despite lack of arraignment because accused, who had notice of charges and adequate opportunity to prepare defense, was not deprived of any substantial right), the court dismissed the superseding indictment so that Vavlitis would be tried on the indictment on which he had been arraigned. We note that if the trial court had dismissed the case, as Vavlitis requested, the government could have appealed such a ruling without violating the Double Jeopardy Clause. See Scott, 437 U.S. at 98-99 ___ _____ (holding that defendant who obtained dismissal of proceedings on grounds unrelated to factual guilt or innocence suffers no injury under Double Jeopardy Clause if government appeals). A fortiori, the continuation of the prosecution before the ___________ same fact-finder did not violate the double jeopardy prohibition. Vavlitis's next argument is that the indictments contained materially different allegations, so that a variance of proof and an improper amendment of the charges resulted from the midtrial substitution, and that this unfairly prejudiced the defense. We note that defense counsel failed to specifically raise these issues below. Assuming these issues were preserved, we find no error. -8- 8 In the first place, there was no material variance of proof. A variance occurs when the proof differs from the allegations in the indictment. United States v. Fisher, 3 ______________ ______ F.3d 456, 462 (1st Cir. 1993). A variance is material and reversible only if it has affected the defendant's "'substantial rights'": to be informed of the charges; and to prevent a second prosecution for the same offense. Id. at ___ 463 (quoting United States v. Tormos-Vega, 959 F.2d 1103, _____________ ___________ 1115 (1st Cir.), cert. denied, 113 S. Ct. 191-92 (1992)). The _____ ______ charging paragraphs of the superseding and original indictments in this case alleged that the check kiting scheme enabled Vavlitis to obtain "$1,615,968.00 more or less, owned by and under the custody and control of Atlantic Bank and Bank of New England." The original indictment, on which Vavlitis was arraigned and convicted, alleged a "net ultimate loss" of $932,653.00. The evidence showed a pattern of deposits and withdrawals between Vavlitis's accounts in the two banks, so that on the day his accounts were frozen, a total overdraft of $1,615,968.92 existed in his Atlantic Bank accounts, while Bank of New England registered a positive balance of $683,292.63. The proof comported with the charges. Vavlitis's argument that the charges were improperly amended is also unavailing. An amendment occurs when the charging terms of the indictment are altered after -9- 9 the grand jury has last passed upon them. United States v. _____________ Dunn, 758 F.2d 30, 35 (1st Cir. 1985). Midtrial amendments ____ are deemed prejudicial per se for the following reasons: to ______ preserve the right of the person accused of an infamous crime to have a grand jury vote on an indictment, to prevent reprosecution for the same offense, and to protect the right of the accused to be informed of the charges. See United ___ ______ States v. Kelly, 722 F.2d 873, 876 (1st Cir. 1983), cert. ______ _____ _____ denied, 465 U.S. 1070 (1984). Although the trial court's ______ substitution of an indictment alleging a "net ultimate loss" for an indictment alleging the total loss suffered by one of the banks literally altered one of the allegations, it did not constitute an amendment of the grand jury's charges. Both indictments accurately reflected the grand jury's charges. There is ample evidence to support the district court's finding that Vavlitis was "well informed" of the charges in the indictment on which he was arraigned and ultimately convicted. Furthermore, the record does not support Vavlitis's argument that the midtrial exchange of indictments unfairly prejudiced his defense. Vavlitis had been arraigned on the indictment on which he was convicted and had an opportunity to prepare a defense based on it. Only paragraph nine of the superseding indictment differed from the original indictment, and only insofar as the superseding indictment did not -10- 10 describe the "net ultimate loss" resulting from the scheme. On the only day of the trial when the superseding indictment was effective, defense counsel said in his opening statement that the banks had recouped money. He also cross-examined witnesses to elicit that Bank of New England actually held funds in Vavlitis's accounts in May 1990. At no time during the trial did the jury hear that a superseding indictment existed. The prosecutor's opening statement that Vavlitis "left the banks with the $1.6 million loss" was just as consistent with the evidence and with the charging paragraph of the original indictment, as it was with the superseding indictment. There is thus no support for Vavlitis's arguments claiming a double jeopardy violation, a variance of proof, and a prejudicial amendment of the charges. We hold that the district court did not err in dismissing the superseding indictment in this case, and in allowing the trial to proceed on the original indictment, following defense counsel's objection that his client had not been arraigned on the superseding indictment. B. Reasonable Doubt Instruction B. Reasonable Doubt Instruction ____________________________ Vavlitis's next argument is that the trial court provided an erroneous jury instruction defining reasonable doubt. The jury instruction on reasonable doubt stated: It is not required that the government prove guilt beyond all -11- 11 possible doubt, the test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense. It does not mean that the government has an obligation to prove the charge in this count to an absolute or mathematical certainty. Proof beyond a reasonable doubt does not mean proof to the degree of certainty that you have that the sun will rise tomorrow or if you add five and five you will get ten. It __ does not mean the doubt in the mind of a _________________________________________ juror who is looking for a doubt or _________________________________________ looking for an excuse to acquit, ________________________________________ reasonable doubt means the doubt in the mind of a reasonable juror who is seeking the truth. It is a doubt based on reason and common sense. The test is, are you satisfied that, acting as reasonable persons and applying your reasoning to the evidence before you, you arrive at a conclusion that the offense as charged has been committed by the defendant, and are you so satisfied of that fact as to leave no other reasonable conclusion possible. Reasonable doubt may arise because there is simply not enough evidence or because you do not accept the evidence that was offered. It may be that the evidence is susceptible to one of two interpretations, one favoring guilt, one favoring nonguilt. If that is the case, the defendant is entitled to the benefit of the interpretation that favors not guilty. The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture. The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. (Emphasis added.) -12- 12 Vavlitis avers that the instruction that reasonable doubt is not "the doubt in the mind of a juror who is looking for a doubt or looking for an excuse to acquit" may have reduced the government's burden of proof. According to Vavlitis's brief, the instruction "almost urges the jurors to look askance at any juror" viewing the government's case with skepticism, and it may have enabled some jurors to "brow beat" any others who were inclined to acquit. Vavlitis did not make a specific objection at trial to this aspect of the reasonable doubt instruction. Consequently, we review the instruction only for plain error. See United States v. Colon-Pagan, 1 F.3d 80, 81 (1st Cir. ___ ______________ ___________ 1993); United States v. Campbell, 874 F.2d 838, 841 (1st Cir. _____________ ________ 1989). We find no such error. Considering the propriety of a single instruction on appeal, we evaluate the challenged instruction in the context of the overall charge. See United States v. ___ ______________ DeVincent, 632 F.2d 147, 152 (1st Cir.), cert. denied, 449 _________ _____ ______ U.S. 986 (1980). We keep in mind that "[t]hat which, standing alone, may fall short of perfection may nonetheless be tolerable in the context of a charge which adequately instructs the jury on the standard it is to apply." Id.  ___ Although cluttered with unnecessary language, the reasonable doubt instruction in this case neither undermined the government's burden of proof, nor caused jurors inclined -13- 13 to acquit to be "brow beat[en]." The trial court specifically instructed the jurors "to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violating individual judgment," but never to surrender an "honest conviction . . . solely because of the opinion of your fellow jurors." Instead, the challenged instruction addresses the state of mind of the jurors. It exhorts the jurors to view the evidence rationally, not to look for an excuse to acquit, because such a mindset would not produce a reasonable doubt, but to view the evidence with the intent to seek the truth. "Instructions which thus urge that the jury's decision should be the product of a rational thought process, while perhaps 'unwisely emphatic,' have been upheld in the overwhelming majority of cases. We cannot say that the present formulation constitutes reversible error." Id. at 153 ___ (citations omitted); see also Watkins v. Ponte, 987 F.2d 27, ________ _______ _____ 32 (1st Cir. 1993) (upholding a similar jury instruction). Vavlitis also argues on appeal an issue that he raised at trial, that the reasonable doubt charge is flawed because it did not define reasonable doubt as that which would cause a juror to "hesitate to act on the most important of affairs." "This Court has emphasized that reasonable doubt does not require a specific definition." United States _____________ v. O'Brien, 972 F.2d 12, 16 (1st Cir. 1992). In fact, we _______ -14- 14 have criticized the use of "hesitate to act" instructions, and we have held that the failure to include such an instruction is not reversible error. See id. at 15-16.  ___ ___ Because we recognize that we must "tolerate a reasonable range of expression" unless we impose pattern jury instructions, Watkins, 987 F.2d at 32 (quotation omitted), we _______ hold that the trial court's instruction defining reasonable doubt was not erroneous. We note, however, that this instruction contains language that is unnecessary, could confuse the jury, and provides fertile grounds for objections. Reasonable doubt is a fundamental concept that does not easily lend itself to refinement or definition. See ___ United States v. Olmstead, 832 F.2d 642, 645 (1st Cir. 1987), _____________ ________ cert. denied, 486 U.S. 1009 (1988).  _____ ______ C. Evidence of Fraudulent Intent C. Evidence of Fraudulent Intent _____________________________ The final issue on appeal is whether the district court erred in denying Vavlitis's motion for judgment of acquittal at the conclusion of the government's case. The motion for judgment of acquittal alleged that there was insufficient evidence of fraudulent intent to support a verdict of guilty. In reviewing a denial of a motion for judgment of acquittal, we consider the evidence in a light congenial to the government. United States v. Victoria Peguero, 920 F.2d _____________ ________________ 77, 86 (1st Cir. 1990), cert. denied, 111 S. Ct. 2053 (1991). _____ ______ -15- 15 The evidence is sufficient if "any reasonable juror . . . ___ could have found the essential elements of the crime beyond a reasonable doubt." United States v. Rodriguez Cortes, 949 ______________ _________________ F.2d 532, 543 (1st Cir. 1991) (emphasis in the original) (quotation omitted). "The government need not disprove every reasonable hypothesis of innocence if the record as a whole supports a verdict of guilt beyond a reasonable doubt." Id. ___ Satisfaction of the mens rea element of the bank ____ ___ fraud statute requires proof that the defendant acted knowingly and with intent to defraud. See 18 U.S.C.  ___ 1344(1); United States v. Rodriguez-Alvarado, 952 F.2d 586, _____________ __________________ 589 (1st Cir. 1991). To act with "intent to defraud" means to act "with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." United ______ States v. Cloud, 872 F.2d 846, 852 n.6 (9th Cir.), cert. ______ _____ _____ denied, 110 S. Ct. 561 (1989). Fraudulent intent may be ______ established by circumstantial evidence and by reasonable inferences from facts and situations. United States v. ______________ Celesia, 945 F.2d 756, 759 (4th Cir. 1991); see also _______ _________ Rodriguez-Alvarado, 952 F.2d at 589.  __________________ The record in this case contains evidence generating a reasonable inference of knowledge and fraudulent intent. The evidence that Vavlitis was a business person who -16- 16 had borrowed more than a million dollars from the banks indicates that he was generally knowledgeable about financial matters and banking. Vavlitis set up the commercial accounts described in the indictment ostensibly to serve separate business interests; presumably, transactions between accounts should not have been frequent. In a two month period within the time frame alleged in the indictment, March through April 1990, Vavlitis deposited over 450 checks from one of the seven accounts into another of the seven accounts. This means that on average, Vavlitis deposited ten checks per banking day, drawn from one of the seven accounts into another of these accounts, resulting in the movement of approximately $69 million. According to a witness from Bank of New England, two of these accounts related to land holdings for which one would expect to see very little account activity. Because Vavlitis wrote checks to third parties while he was making deposits, the deficit between the amount of funds he actually had and the amount of funds credited upon each deposit increased each day. Day after day in this two month period, there were insufficient funds in these accounts to cover the checks Vavlitis wrote, notwithstanding the existence of any other accounts or secured loans Vavlitis may have maintained at the banks. Virtually all deposits (99.8%) into these seven accounts were from one of the other seven accounts, rather than from third -17- 17 party sources. A reasonable juror could infer that no legitimate business practice accounted for this pattern. An expert witness, FBI Special Agent Daniel Dubree, described a prototypical check kiting scheme to the jury, analyzed the activity in the seven accounts, and opined that Vavlitis's frenetic deposits and withdrawals constituted check kiting. He explained that the Bank of New England accounts served as intermediary accounts to create a float period for checks circulating in and out of the Atlantic Bank accounts. For this reason, the check kiting scheme persisted, even though Bank of New England, suspecting check kiting, notified Vavlitis in late January 1990 that it would no longer honor checks written against uncollected funds; Atlantic Bank continued to credit his accounts on the date checks were deposited until the accounts were frozen and the overdrafts exceeded $1.6 million. Dubree testified that Vavlitis's transactions followed a pattern of transfers from one account into another specified account, that this appeared to be no accident, and that it would have made it easier for Vavlitis to track how much he needed to deposit to cover checks he had already written. We acknowledge that "[t]he mere existence of a check kiting scheme does not as a matter of law imply" the specific intent necessary for a bank fraud conviction. Rodriguez-Alvarado, 952 F.2d at 589. But considering __________________ -18- 18 Vavlitis's business experience, the notice he received from Bank of New England, the size of the Atlantic Bank loss, the intricacy and sophistication of the scheme, and the absence of a legitimate purpose for the transactions, a reasonable juror could conclude that Vavlitis acted with the requisite knowledge and specific intent to use the float period to inflate his account balances and to defraud the banks. We hold that the trial court properly denied Vavlitis's motion for judgment of acquittal. Therefore, Vavlitis's conviction is, Affirmed. Affirmed. _________ -19- 19